**Ex Parte Curtis Eugene BROWN, Applicant.**

No. AP–75377.

Court of Criminal Appeals of Texas.

Nov. 1, 2006.

**540**

Albert A. Pena, III, Corpus Christi, for Appellant.

Robert C. Lassman, Asst. District atty., Cuero, Matthew Paul, State's Atty., Austin, for State.

### OPINION

COCHRAN, J., delivered the opinion of the Court, in which KELLER, P.J., and MEYERS, PRICE, WOMACK, JOHNSON, HERVEY and HOLCOMB, JJ., joined.

Applicant pled guilty to aggravated sexual assault of a child, and the trial court placed him on community supervision. The trial court later adjudicated his guilt and sentenced him to prison. Applicant then filed a motion for new trial claiming that newly discovered evidence proved that he was actually innocent of the original offense because the child, at that time, said that she had lied about the sexual assault. The trial judge interviewed the child *in camera*, but he denied the motion for new trial because he did not believe her recantation. Applicant filed this writ application two years later and made the same claim—that the child's recantation was newly discovered evidence that proves his innocence. The habeas judge entered findings of fact and recommended that we grant relief. We hold that this evidence is not newly discovered, and, in any event, applicant failed to prove his innocence. We therefore deny relief.

### I.

On July 26, 1998, when C.B. was seven or eight years old, she told her mother, Valerie, that applicant, C.B.'s great-uncle, had sexually molested her. C.B. used hand motions to show Valerie what applicant did to her. Jacqueline, Valerie's sister, was present when C.B. described the sexual abuse to her mother. Valerie, who stated that "I believe anything my daughter said," was angry when C.B. told her about the incident. In fact, she testified

that she "snapped. I went off. I started cussing. I went looking for him" and did not even "finish listening to the whole story." When both Valerie and Jacqueline confronted him, applicant said "he hadn't done that."

Someone anonymously called Child Protective Services, which investigated the allegation. Valerie said that she did not call the police because "families stick together." She later testified before the grand jury that she believed C.B.'s accusations because, in her mind, no child is going to make up something like that. At the time C.B. told her of the sexual abuse, as well as at the time of her grand jury testimony, Valerie believed her daughter and knew of no reason why C.B. would make up a story. Valerie also told the grand jury that applicant had molested her when she was a child.

On March 21, 2000, applicant pled guilty to aggravated sexual assault of a child and was placed on ten years' community supervision. The State filed a motion to adjudicate guilt in November of 2001, alleging a new DWI offense as well as several technical violations. The trial court adjudicated guilt and sentenced applicant to twelve years' imprisonment on February 27, 2002. Applicant timely filed a motion for new trial based on "newly discovered evidence" that he was not guilty of sexually molesting C.B. He attached a recantation affidavit signed by C.B.[1] and four other affidavits signed by (1) himself, (2) Valerie,[2] (3) Jacqueline,[3] (4) and C.B.'s great-grandmother. C.B.'s and Valerie's affidavits said that C.B. had lied when she stated that applicant had sexually molested her. At the hearing on the motion for new trial, the parties agreed that the trial judge could interview C.B. in chambers about her recantation. After that interview, the trial judge stated, "I do not believe the recantation of the child," and he denied the motion for new trial.

After two more years, applicant filed an application for a writ of habeas corpus, making the same claim of actual innocence and attaching the same affidavits. We remanded the case to the trial court to conduct a live evidentiary hearing.[4] At the habeas hearing, Valerie testified that C.B. had lied about the sexual assault. She said that C.B. was mad at applicant "because he made her get off the couch and put her on the floor." "She didn't want to get on the floor. She wanted to sleep on the couch." Valerie testified that, about two years after this couch incident, C.B.

1. C.B.'s affidavit stated that she "did not tell the truth about Uncle Curtis the first time. When they asked me what happened I told them that I was scared that he was going to do something to me. He didn't do nothing to me, but I was mad at him, because he made me get up."

2. In her affidavit, Valerie stated that after she had confronted applicant, she "told [her] Grandmother what had happened. We talked it over and I agreed to leave it as something in the family. I decided not to report it to the authorities. In my mind I still believed that Curtis had molested my daughter.... Several weeks later I was taken to the Refugio County Grand Jury and asked to give testimony. During that testimony I told several lies. I

was still angry with Curtis and I wanted him to pay for what he did to [C.B.]. I remember telling the Grand Jury that he had molested me when I was a child and that was not true. I'm not very sure of all that I told the Grand Jury that was a lie but there were several things that were just out right lies."

3. Jacqueline's affidavit stated that she thought that she was called to the grand jury to testify about applicant's drug use. She also stated that "I know that Uncle Curtis was a 'Player.' That is he had a lot of women. I don't believe that he would ever have to molest anyone."

4. The judge who heard the motion for new trial had retired, so a new judge presided over the habeas hearing.

came to her, crying and saying that "she got Uncle Curt in trouble." This recantation happened shortly before the hearing on the motion for new trial.

During the habeas hearing, the State questioned Valerie about two statements she now claimed were lies. The first was her grand jury testimony that applicant had molested Valerie when she was young. Valerie testified that she said this because "I wanted to do anything possible if he had touched my daughter to get him in trouble. I'd say anything." Valerie also told the grand jury that applicant had admitted to his mother (Valerie's grandmother) that he had "a problem with molesting children." Valerie explained that she just made up some of her grand jury testimony:

> Q: When you testified to the grand jury—and let's be clear about that—that was, I don't have a date. When you testified to the Refugio County Grand Jury, at that time you did not really want your uncle, Curtis Brown, to be indicted for this offense of sexually assaulting your daughter?
>
> A: That's correct.
>
> Q: You wanted it handled within the family?
>
> A: That's correct.
>
> Q: And, yet, you still told this lie about how he had molested you when you were a child?
>
> A: Yes.
>
> Q: Why? Why did you tell the grand jury a lie like that?
>
> A: Because my daughter—I wanted— if he hurt my daughter, I wanted him to hurt, too.

> Q: But you didn't want to get him indicted?
>
> A: I wanted—if it happened, I want him to get help.
>
> Q: But you wanted to hurt him?
>
> A: Yeah, and so—in so many words, yeah.
>
> Q: But you didn't want to get him indicted?
>
> A: I didn't want him to go to prison.
>
> Q: So you wanted to hurt him, but you wanted him to get help. You didn't want him to go to prison and you were willing to lie in order to get all of that, is that correct?
>
> A: Yes.
>
> Q: Now, Curtis Brown has admitted to your grandmother, his mother, that he has a problem about molesting children, hasn't he?
>
> A: If he did, I don't know. You would have to ask my grandmother that.
>
> Q: Well, that's what you told the grand jury?
>
> A: That's what who?
>
> Q: That's what you testified to the grand jury.
>
> A: Like I told you [a]while ago, I said a whole lot of things to the grand jury that was untrue.
>
> Q: Well, was that something you made up out of thin air or had you heard that?
>
> A: It might have been something I've made up, but my grandmother haven't told me anything like that.

Valerie also testified at the habeas hearing that she did not remember when C.B. actually told her that she had lied about applicant sexually assaulting her.[5]

---

5. The prosecutor questioned Valerie about the timing of C.B.'s recantation:
> Q: When did she tell you this?

> A: Honestly, I can't answer that, but it was after grand jury, after we had the grand jury hearing; sometime after that. I'm not

C.B., who was in the ninth grade at the time of the habeas hearing, was equivocal about whether she had testified to the grand jury. She did remember telling her mother that applicant had molested her. She did not know why she would make up a "vicious story" about her uncle. The State asked C.B. about the conversation she had with the trial judge in his chambers almost four years earlier:

Q: Do you remember going into his office and talking to him alone?

A: Oh, yes, sir.

Q: Do you remember what you told him?

A: I told him that he didn't do it and I was lying.

Q: Did you admit that, in fact, you had told the truth?

A: Sir?

Q: Did you also tell him you had originally told the truth? Well, let's back up. Why did you lie, if you lied when you first told your mother? Why did you lie to her?

A: Because he made me mad.

Q: How did he make you mad?

A: Because I was asleep and he made me get off the couch.

Q: That made you mad so you knew he would get in big trouble if you told your mother that he had molested you?

A: Yes, sir.

Q: And you wanted him to get in really big trouble for doing this, is that right? Is that right?

A: Yes, sir.

Q: And, [C.B.], one of your aunts says that you've always been a truthful child, is that true?

A: Yes, sir.

Q: So why would you make up a vicious story like that about your uncle merely for making you get off the couch?

A: I don't know.

C.B. then stated that it was hard for her to remember everything about the alleged offense because it was seven years after that event. "I can't remember. It's been a long time." The State then questioned her about one possible motive for the recantation—pressure from her family. C.B. responded that she did not know if her family talked very much about applicant being in prison. She said that her great-grandmother, applicant's mother, had never told her that applicant was in prison or that he was in prison because of her.

Applicant testified that on the night of the incident he went to the Cowboy Lounge and "had a few beers." He decided to stay at his mother's house to avoid getting on the highway. When he got to his mother's house, applicant noticed that C.B. was sleeping on the love seat, approximately four or five other children were sleeping on pallets on the floor, and two adults were on the couch. Applicant testified that there were about fifteen people in his mother's house that night. Applicant said that he picked C.B. up and put her on the floor. Then he went into his father's

sure how long after that, but she came to me and told me.
Q: Are we talking weeks, months, years?
A: I'm not sure.
Q: You have no idea whether it was years or days after the grand jury?
A I'm not sure. This has been a long time that this has happened. I'm not going—it's not going to—

. . . .
Q: Well, you don't know when she told you this story that—
A: I know she told it to me, but when she told it to me, I don't, I don't remember.

room, got a blanket, and slept on the love seat. He didn't know if she ever woke up. Applicant said that he pled guilty to sexually assaulting C.B. because "I have a nephew that's been sent to prison with a similar case, and my dad told me that if I didn't have a decent lawyer, it was probably going to happen to me too."

David Guy, a deputy sheriff with specialized training in interviewing child sex-abuse victims, testified that he interviewed C.B. on August 8, 1998. After establishing rapport, Deputy Guy asked C.B. to describe the incident with applicant. Nothing she said raised a "red flag" in the sense that her statements were not accurate. He testified,

> Third graders are generally either seven or eight and the child simply doesn't have the emotional and mental sophistication to be a successful actor. They, if they present a play or something to that sort, it's rather mechanical and rote memorization of very short lines. They just don't have the capability of memorizing a sophisticated story and recanting [sic: recounting?] it.

C.B. told the deputy that she was very concerned about the effect that this incident would have on her family. Deputy Guy testified that it is "not at all" unusual for children who have suffered sexual abuse to later recant their testimony.

The habeas judge entered findings of fact summarizing the pertinent dates, events, and testimony. He did not make any finding concerning credibility of any of the witnesses, but he did conclude that "the new evidence unquestionably establishes Applicant's actual innocence of the aggravated sexual assault of C.B." He recommended that this Court grant relief.

## II.

■ In 1996, this Court recognized that "the incarceration of an innocent person is as much a violation of the Due Process Clause as is the execution of such a person." [6] Additionally, we have held that claims of actual innocence based upon newly discovered evidence are cognizable on post-conviction writs of habeas corpus.[7] This is true regardless of whether the applicant pled guilty or had a jury trial; an applicant can bring an actual-innocence claim based on newly discovered evidence in either situation.[8]

■ This Court now recognizes two types of "innocence" claims. The first—a *Herrera* claim—is a substantive claim in which the person asserts a "bare claim of innocence" based solely on newly discovered evidence.[9] The other type of innocence claim—a *Schlup* claim—is one that "does not by itself provide a basis for relief," but

**6.** *Ex parte Elizondo*, 947 S.W.2d 202, 206 (Tex.Crim.App.1996).

**7.** *See State ex rel. Holmes v. Third Court of Appeals*, 885 S.W.2d 389, 398 (Tex.Crim.App. 1994, orig. proceeding) (stating that actual innocence claims for inmates sentenced to death are cognizable in a habeas corpus application); *see also Ex parte Elizondo*, 947 S.W.2d at 205.

**8.** *Ex parte Tuley*, 109 S.W.3d 388, 393–96 (Tex.Crim.App.2002). In *Tuley* this Court stated,

> Convictions based on knowing, intelligent, and voluntary pleas of guilty ought to be afforded the highest level of respect.
>
> . . . .
>
> If we have reason to think that an applicant's plea was accurate and reliable, we would conclude that the claim would not support relief for actual innocence. But when a habeas record supports a finding that new evidence unquestionably established an applicant's innocence, it is difficult to conclude that a prior guilty plea was accurate or reliable.

*Id.* at 394.

**9.** *Id.* at 390.

is intertwined with constitutional error that renders a person's conviction constitutionally invalid.[10]

Establishing a bare claim of actual innocence is a Herculean task. We have stated that "any person who has once been finally convicted in a fair trial should not be permitted to wage, and we do not permit him to wage, a collateral attack on that conviction without making an exceedingly persuasive case that he is actually innocent."[11] Thus, to succeed in an actual innocence claim the applicant must show "by clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence."[12] This showing must overcome the presumption that the conviction is valid and it must unquestionably establish applicant's innocence.[13]

Not only must the habeas applicant make a truly persuasive showing of innocence, he must also prove that the evidence he relies upon is "newly discovered" or "newly available." The term "newly discovered evidence" refers to evidence that was not known to the applicant at the time of trial and could not be known to him even with the exercise of due diligence. He cannot rely upon evidence or facts that were available at the time of his trial, plea, or post-trial motions, such as a motion for new trial.[14] The trial is "the main event,"[15] it is not a try-out on the road to a post-conviction writ of habeas corpus.[16] A claim of actual innocence is not an open

---

**10.** *See Schlup v. Delo*, 513 U.S. 298, 315, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (comparing a bare-innocence claim with the claim that Schlup was making on habeas corpus and stating "[Schlup's] claim for relief depends critically on the validity of his *Strickland* and *Brady* claims. Schlup's claim of innocence is thus 'not itself a constitutional claim, but instead a gateway through which a *habeas* petitioner must pass to have his otherwise barred constitutional claim considered on the merits' ") (footnote omitted); *Ex parte Tuley*, 109 S.W.3d at 390.

**11.** *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex.Crim.App.1996).

**12.** *Ex parte Tuley*, 109 S.W.3d at 392; *see also State ex rel. Holmes*, 885 S.W.2d at 399 (" To be entitled to relief, however, petitioner would at the very least be required to show that based on proffered newly discovered evidence and the entire record before the jury that convicted him, 'no rational trier of fact could find proof of guilt beyond a reasonable doubt.' ") (quoting *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

**13.** *Id.*

**14.** *See, e.g., Ex parte Briggs*, 187 S.W.3d 458, 465 (Tex.Crim.App.2005) (rejecting applicant's "actual innocence" claim based, in

part, on trial court's finding that the medical evidence supporting applicant's claim had been available at the time of trial); *Ex parte Tuley*, 109 S.W.3d at 403 (noting that "[t]he fact that there was some evidence at the time of the applicant's trial that could have been used to impeach the complainant, does not mean that her affidavit recanting her trial testimony is not new evidence that affirmatively demonstrates the applicant's innocence") (Price, J., concurring in denial of reh'g).

**15.** *Anderson v. Bessemer City*, 470 U.S. 564, 574–75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *see also Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (stating that the determination of guilt or innocence in a criminal trial is "a decisive and portentous event" because "[s]ociety's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens").

**16.** *See Herrera v. Collins*, 506 U.S. 390, 409–11, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (discussing history of procedural rules requiring a defendant to file a motion for new trial based on newly discovered evidence, including evidence of actual innocence, within a definite time period).

window through which an applicant may climb in and out of the courthouse to relitigate the same claim before different judges at different times. Thus, habeas relief is not available to one who has already litigated his claim at trial, in post-trial motions, or on direct appeal. Claims that have already been raised and rejected are not cognizable,[17] but an exception to this rule is when "direct appeal cannot be expected to provide an adequate record to evaluate the claim in question, and the claim might be substantiated through additional evidence gathering in a habeas corpus proceeding."[18] Therefore, this Court will often provide an opportunity for a writ applicant to proffer additional evidence to establish his claim of actual innocence, even when a small portion of that evidence was available at an earlier time.[19]

In *Ex parte Franklin*,[20] this Court held that, before a habeas applicant is entitled to a hearing, the applicant must make a claim that, if true, establishes affirmative evidence of his innocence.[21] Then, at the hearing, the trial judge assesses the witnesses' credibility, examines the "newly discovered evidence," and determines whether that "new" evidence, when balanced against the "old" inculpatory evidence, unquestionably establishes the applicant's innocence.[22] The habeas judge then sets out findings of fact and conclu-sions of law, and he makes a recommendation to this Court. Upon submission to this Court, we review the factual findings with deference because the habeas judge is in the best position to make credibility judgments.[23] Even though deference is the prescribed standard, we are not bound by the habeas judge's findings, conclusions, or recommendations when they are not supported by the record.[24]

## III.

In this case, applicant argues that the habeas court's findings of fact and conclusions of law support the conclusion that he is actually innocent of sexually assaulting C.B. because of newly discovered evidence of C.B.'s recantation. The State asserts that the evidence presented at the habeas hearing was neither newly discovered nor credible. The State argues that

> [p]erhaps the most compelling argument in this case is that the recantation at the writ of habeas corpus hearing was not "newly discovered evidence," which is required in *Tuley*. ... The very affidavit used in the application for writ [of habeas corpus] was used in the motion for new trial. ... The actual trial judge who heard the guilty plea (Judge Kilgore) and considered its evidence, which

---

17. *See Ex parte Acosta*, 672 S.W.2d 470, 472 (Tex.Crim.App.1984) (refusing to address a claim which was previously raised and rejected on direct appeal).

18. *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim.App.1997).

19. *See Ex parte Tuley*, 109 S.W.3d at 403 (Price, J., concurring in denial of reh'g).

20. 72 S.W.3d 671 (Tex.Crim.App.2002).

21. *Id.* at 678 ("[W]e hold that when an applicant asserts a *Herrera*—type claim based on newly discovered evidence, the evidence presented must constitute affirmative evidence of the applicant's innocence. Once the applicant provides such evidence, it is then appropriate to proceed with a determination of whether the applicant can prove by clear and convincing evidence that no reasonable juror would have convicted him in light of the newly discovered evidence").

22. *Id.*

23. *Ex parte Thompson*, 153 S.W.3d at 417–18, 425.

24. *Id.* at 417–18.

included the plea memorandum, the judicial confession, the sheriff's department's report which contained a statement of the victim, and the Children's Protective Services Report, interviewed the complainant in chambers and found her recantation to be unbelievable.[25]

We agree that the evidence applicant presented at the habeas hearing was not newly discovered. He simply attached the same affidavits to his writ application that he had attached to his motion for new trial two years earlier. Nonetheless, we remanded the case for a live evidentiary hearing to give applicant an opportunity to present whatever "new" evidence he had to support this "old" allegation, as we sometimes permit in claims of ineffective assistance of counsel.[26]

The first issue now before us is what "newly discovered evidence" did the applicant present at the habeas evidentiary hearing. The habeas judge mentions the former hearing on the same exact issue, but applicant provides no rationale for why this claim or the evidence supporting it is different in quality from the evidence presented at the hearing on the motion for new trial. We are unable to find any substantively new and compelling evidence in the habeas record that the trial judge did not consider at the time he denied applicant's motion for new trial. Indeed, the habeas record does not contain the CPS records or the police offense report that the original trial judge had before him at the time of applicant's plea and of the motion for new trial hearing. Nor does the habeas judge make any reference to these materials, which are surely relevant to the issue of applicant's guilt or inno-

cence. This habeas record does not contain any significant "new" exculpatory evidence, and it fails to include significant "old" inculpatory evidence.

 The second issue before us is the inherent persuasiveness of the evidence establishing innocence. The habeas judge briefly mentions the live testimony from the habeas hearing, but says nothing about the credibility of the witnesses. The habeas judge states, "C.B. testified that her [great-] uncle never molested her, [and] that she had lied about it [.]" He concludes that "[t]he evidence of Applicant's guilt is far outweighed by the evidence of his innocence." But there is no explanation of whether or why this evidence is more believable than the evidence supporting applicant's guilt. And the habeas judge points to nothing in the record that "unquestionably" demonstrates applicant's innocence.

The "actual innocence" conclusion does not logically flow from the record evidence. First, one might assume that the habeas judge must have believed C.B. more than the trial judge who first heard and rejected her recantation some three years earlier, even though he did not say so in his findings. But there is no explanation either in the evidence or the findings about any objective basis for this unstated assumption. C.B.'s testimony at the habeas hearing is vague, uncertain, and nonspecific. She simply claims a lack of memory as she makes a global denial of sexual abuse. Some seven years after the event, she testified that she made up her allegation merely because she was mad at applicant for moving her in the middle of the night from a love seat to the floor to be with her

25. State's Brief at 7.

26. *See Ex parte Nailor,* 149 S.W.3d 125, 130–31 (Tex.Crim.App.2004) (stating that a defendant claiming ineffective assistance of counsel may re-urge a claim in a habeas corpus application that he had previously raised in a direct appeal if he provides additional evidence to prove his claim).

sleeping cousins. This explanation is dubious at best.

Second, although C.B.'s mother testified to her daughter's general truthfulness, and she said that she believed C.B. at the time of the outcry because her daughter is a truthful person, she now says that her daughter was a liar on this one crucial topic. Her testimony creates a logical contradiction: C.B. is both a truthful person and a liar who accused her great-uncle of sexual abuse merely because she was angry with him for moving her from a sofa to the floor one night. A reasonable conclusion would be that she is willing to lie about almost anything simply because she is momentarily angry.

Third, the conclusion that C.B. was an accomplished liar at the age of seven is contradicted by Deputy Guy, who found her account of the sexual abuse credible and concluded that nothing she said raised a "red flag" to him. He has specialized training in interviewing child sex-abuse victims, but the habeas judge never mentioned Deputy Guy's testimony or explained why his expert testimony was not credible and should be rejected.

Fourth, Valerie testified before the grand jury that applicant had sexually abused her when she was a child, but, at the habeas hearing, she explained that she just made up lies because she was mad at applicant.[27] If one accepts the fact that Valerie makes up lies so easily, then why would anyone credit her testimony at the habeas hearing any more than her testimony to the grand jury? It would seem a logical conclusion from this record that she

is simply not a credible person and that all of her testimony is equally suspect.

Applicant's testimony, on the other hand, is startlingly specific, given his position that nothing unusual happened that evening and that C.B. was never even fully awake when he moved her from love seat to the floor. Applicant's explanation for pleading guilty, even though he was not guilty, was because he had a nephew who had gone to prison for a similar offense, and his father told him that if he didn't have a decent lawyer, he—applicant— would probably go to prison also. This explanation, though not entirely implausible, is hardly persuasive.

Finally, the timing of C.B.'s recantation is, at least on its face, highly suspicious. It was only after applicant's guilt was adjudicated and he was sentenced to twelve years in prison—more than three years after the alleged offense—that C.B. suddenly told her mother that she had been lying all along. She, her mother, her aunt, and applicant's mother[28] all signed affidavits just in time to file a motion for new trial. Although it is entirely possible that a child suffering from a guilty conscience for causing an innocent relative to go to prison because of her lies might suddenly admit to those lies, there is nothing in the record to indicate that C.B. knew that applicant might go to prison because of her earlier allegations. There could, of course, be some logical explanation for the coincidental timing of C.B.'s sudden recantation, but it is not in the record.

In sum, there is nothing in the record that demonstrates (1) why the habeas judge did believe, or should have believed,

---

27. Strangely, in the affidavit Valerie made for the motion for new trial hearing, she stated, "I thought everything was dropped and never knew that [applicant] was on probation for this case. I always thought he was on probation for drugs."

28. Applicant's mother's affidavit stated that the alleged incident took place in her home, but she is a light sleeper because of the medications she takes, and she or someone else in the home would have seen and heard any untoward activities, had they occurred.

that applicant's witnesses at the habeas hearing were credible and (2) how this testimony differs from the previous testimony at the motion for new trial such that it constitutes "newly discovered evidence" that was not available and could not have been discovered for that hearing. Although courts must carefully examine a credible claim of actual innocence—even one made many years after the alleged crime—recantations in "She said, He said" sexual assault cases are not rare.[29] Such post-conviction claims should not be accepted without close scrutiny nor, generally, without strong corroboration by independent evidence. In the present case, the habeas record does not show that applicant's evidence is either newly discovered or that it unquestionably establishes his innocence.

We therefore deny relief.

KEASLER, J., concurred in the judgment.

**29.** *See Ex parte Elizondo,* 947 S.W.2d 202, 209–10 (Tex.Crim.App.1997); *Ex parte Franklin,* 72 S.W.3d 671 (Tex.Crim.App.2002); *Ex parte Tuley,* 109 S.W.3d 388, 392 (Tex.Crim. App.2002); *Ex parte Harmon,* 116 S.W.3d 778 (Tex.Crim.App.2002).