

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,264

### EX PARTE JESSE BENAVIDES, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 2001CR0493-W1 IN THE 187TH JUDICIAL DISTRICT COURT
### FROM BEXAR COUNTY

KEASLER, J., announced the judgment of the Court and filed an opinion in which JOHNSON and COCHRAN, JJ., joined. MEYERS, J., filed a concurring and dissenting opinion in which HERVEY, J., joined. HOLCOMB, J., filed a dissenting opinion. KELLER, P.J., PRICE, and WOMACK, JJ., dissented.

## O P I N I O N

Jesse Benavides seeks habeas corpus relief, alleging that he is actually innocent of aggravated sexual assault based on the recantation of the victim, Irma Pennington. Contrary to the trial judge's findings, we find that Pennington's recantation is not credible. We also hold that the trial judge applied an improper, less-stringent standard of review when recommending to grant relief. We therefore deny habeas relief.

## Background

In July of 1999, Pennington told Bexar County Sheriff's Office Detective Lorenz that Benavides sexually assaulted her in May of 1999. Pennington said that she went to pick up her van from the Performance Body Shop, but because she did not have the insurance money to pay for the repairs in hand, a woman at the shop would not release the van to her. The woman at the shop offered to have Benavides, a porter at the shop, drive Pennington home in her van to see if the insurance check arrived in the mail. Pennington recalled that Benavides was wearing a blue shirt with the name Jesse on it.

Benavides drove Pennington the thirty miles to her house. When they arrived, he asked to use her phone, and Pennington allowed Benavides to come inside her house. Because Pennington had been disabled by a roll-over car accident in 1995, she had trouble walking and sat down on the couch next to Benavides while he used the phone. Benavides then held Pennington's arm as they looked around her house. The two returned to the couch, and Benavides started touching Pennington's chest and put his hand down her pants. She "didn't fight." Explaining this, Pennington told Detective Lorenz:

> I am a disabled ARMY [sic] nurse[,] and I remember always telling my patients and their family that women should not resist rape and the injuries would be minimal. It was very difficult to not do anything[,] but I didn't resist.

> The thing I didn't want to make him mad and the thing I said nicely was I don't feel very comfortable with the things that he was doing. He asked where the bed was[,] and he held my hand and took me to the bed that is next to the living room. He took my clothes off, he only unzipped his pants and brought them down a bit to about his knees and introduced his penis into my vagina and did not stay in very long. I do not know[] if he finished because I don't have sensation on my right side[,] even on the inside.

Benavides left and took Pennington's van back to the shop.

In July, Pennington returned to the shop and told the manager about the incident. The manager told Pennington that he could not do anything and advised her to call the police.

In March of 2000, Pennington identified Benavides in a photo line-up as the individual who sexually assaulted her. At this time, Pennington clarified her understanding of Benavides's name: "After thinking about it[,] and how I came up with the name of Jesse FLACA [sic]. I remembered seeing the last name of FLACA [sic] on the shirt and him telling me that his first name was Jesse." Finally, Pennington stated that she wanted to "file charges" on Benavides "for what he did to" her.

Benavides was charged with sexual assault in January 2001.

On July 20, 2001, Pennington wrote a letter to the trial judge asking the judge to consider placing Benavides on probation.

In September of 2001, the Department of Criminal Justice Community Justice Assistance Division prepared a presentence investigation (PSI) report for the trial judge. The supervision officer who prepared the report called Pennington, and Pennington said that she wanted Benavides to get probation and then hung up. Regarding the sexual assault allegation, Benavides told the supervision officer:

> I took her home. She was a nice lady. She was playing around with me making me laugh. We sat on the couch and whatever happened, happened. I didn't do intercourse with her. I might have played around with her, but that's it. It happened, it did happen. I'm sorry it happened. I regret it[,] and it will never happen again.

In October of 2001, Benavides entered a plea of no contest to the charge. Pursuant to a plea agreement, the trial judge deferred adjudicated and placed Benavides on community supervision for seven years. The State filed a motion to adjudicate Benavides's guilt in November of 2006, alleging that Benavides violated two terms and conditions of his community supervision. In February of 2006, Benavides pled true to the State's allegations, and the trial judge adjudicated his guilt and sentenced him to twenty years' imprisonment.

After Benavides was sentenced, in January of 2008, Pennington executed an affidavit stating that she was in the trial court when Benavides was adjudicated guilty and that she "DID NOT RECOGNIZE HIM AS THE PERSON THAT SEXUALLY ASSAULTED [HER] . . . ." Pennington hand-delivered the affidavit to Benavides's attorney.

## Habeas Proceedings

In April of 2009, based on Pennington's affidavit, Benavides filed an application for a writ of habeas corpus claiming that he is actually innocent. The trial judge held a live evidentiary hearing in September of 2009.

On direct examination by Benavides's attorney during the habeas hearing, Pennington testified that she had been the victim of a sexual assault. At the revocation hearing, Pennington approached Benavides's attorney and told him that she did not recognize Benavides as the man who assaulted her. She maintained that the face of the man who assaulted her is embedded in her mind and that she is certain that Benavides is not her assailant.

On cross-examination by the State, Pennington registered some ambivalence about the statement she had given to the Sheriff's Department in 2000 in which she accused Benavides of sexual assault. She testified that she had been pressured because the detective had been "loud," that some of the initials or signatures on the statement were not hers, and that she did not recall some of things in the statement about the assault. She also noted that her address was incorrect and could not believe that she had signed the statement.

Pennington then recalled the facts about the assault. She admitted that she had been assaulted by someone who worked for the body shop. With the mention of the body shop, Benavides's attorney invoked the rule regarding anyone in the courtroom who had worked at the shop and would be called to testify. Sandy Kowalick, the woman who directed Benavides to drive Pennington home on May 11, 1999, was ordered to leave the courtroom, after which Pennington continued to testify.

Pennington stated that her assailant wore a blue uniform shirt with the name Flaca on it. The prosecutor also asked Pennington if the man who came inside her home to use the phone sexually assaulted her. In response, Pennington retracted her earlier allegation:

> A. You know, sexually assaulted, that's kind of – – the severity, it's very – –
> Q. I can put it another way.
> A. It's a word that doesn't fit, because I was not assaulted – –
> Q. Okay. Let me ask you this – –
> A. It was consensual, I guess you can say.
> Q. Well, let me ask you this: Did the person who drove you home have sex with you on that day?
> A. Yes.
> Q. And did you invite that person, who drove you home that day, to have sex with you on that day? Did you say to him, "I want to have sex with you?"

(Witness Laughs)
A.  I don't remember.
Pennington then stated that she did not recall ever saying that she did not consent. When asked whether she had told prosecutor Kirsta Melton that she had said, "No," to Benavides, Pennington said that she had not, only that she told him that she was uncomfortable.  Pennington asserted that sex had not been something that she wanted that day but that she had allowed it.  Pennington stated that when dealing with sexual assault victims as an army nurse, she learned "never say no" because "more injuries occur."  She stated that this was the reason she did not want to say "no" to Benavides or resist, possibly, but she did not specifically remember.

Pennington continued to waver on the issue of consent when questioned by the State:

Q.  Okay.  So there's really no question, though, at this time that, again, somebody had sex with you on that day, May 11, 1999, and it was not with your consent?

. . .

A.  No.
A.  It was – – those words are not proper, because I wouldn't say that it was not with my consent.  It was with my consent.
Q.  But you did not want – – you did not want to be involved in that at the time; is that correct?
A.  I don't think so.

Pennington also wavered about her position on punishing Benavides:

Q.  There seems to be a sense coming through from [your prior statements] that you did not want the person who sexually assaulted you on that day – – May 11, 1999, to be punished.  Is that accurate?
A.  No.
Q.  Okay.  So, you are telling me today then that you did not want the person who sexually assaulted you to be punished?
A.  No, I'm not saying everything.

. . .

Q. On another day, about a month later or two, did you go back to the body shop? Do you recall going back to the body shop to tell the manager something?

A. Yes.

Q. Okay. Can you tell us what it was that you went back to the body shop to tell the manager?

A. I was just mentioning that I was sexually injured – – that I had sex with the person who came out to the house.

Q. Okay. Now, did you – – why did you feel the desire to go and tell the manager about the incident?

A. So the man will be fired.

. . .

A. And to have common sense to fire the man.

Q. Okay. Why do you think that common sense should lead to the conclusion that that man should be fired?

A. Because it was not somebody that trust – – that they should place trust in him.

The State called Kowalik to rebut Pennington's identification testimony. Kowalik stated that her manager directed her to have a porter drive Pennington home to get the insurance check for the repairs, which had been mailed directly to Pennington. Kowalik asked Benavides, who she knew by the nickname Flaca, to drive Pennington home. Kowalik described Benavides as a basic porter; he would clean cars and the shop and run errands. Kowalik said that Benavides was gone for an abnormal amount of time when he drove Pennington home. She tried to contact him on the radio but could not reach him.

The State also called Assistant Criminal District Attorney Kirsta Melton to testify about her investigation and prosecution of the case. After reviewing the notes from her interview with Pennington, Melton testified that Pennington had told her that she told Benavides "no" three times in response to his sexual advances. Pennington never told her

that the encounter was consensual. Pennington had also been certain about her identification of Benavides, and Pennington never gave any indication that she was pressured to pick someone in the lineup.

At the end of the hearing, the trial judge indicated that he had some difficulty grasping the standard of review for bare actual innocence claims, but he nevertheless concluded that Benavides was entitled to relief. Consequently, he later entered findings of fact and conclusions of law recommending that Benavides's conviction be set aside.

Summarizing his impression of the testimony at the hearing the trial judge found, among other things:

- "that [Pennington] said several different things."

- "[the sum of Pennington's] testimony [was] that – – it wasn't him, and even if it was him, it was consensual."

- "that the evidence presented by the State through the testimony of the State's witnesses was impeachment evidence, impeaching the credibility of the complainant, not direct evidence of Applicant's guilt."

- "that there was direct evidence that the Applicant was in fact the person who drove Irma Pennington home from the body shop on May 11, 1999. Yet, there was no direct evidence presented at the writ hearing that the Applicant did in fact sexually assault Irma Pennington."

- "that there has never been any evidence presented at any stage of this case that Applicant intentionally or knowingly compelled said complainant to submit or participate by the use of physical force or violence."

The trial judge listed the evidence supporting Benavides's guilt as follows:

- Pennington's statement to the Sheriff's Department.

- that Pennington identified Benavides in a line-up.

- that Benavides admitted something "happened" with Pennington in the PSI.

The judge also listed the newly-discovered evidence supporting Benavides's innocence claim:

- Pennington's January 2008 affidavit stating that she did not recognize Benavides as her assailant.

- Pennington's testimony that she is "certain" Benavides was not the man that sexually assaulted her.

- that Pennington signed her initial, 2000 statement to the Sheriff's Department "under pressure."

- that Pennington did not recognize anyone in the line-up at first but identified Benavides after the detective urged her to "choose one."

- that the encounter was consensual, even though Pennington was uncomfortable with it.

The trial judge then found that the newly discovered evidence that Pennington "consented and 'allowed' Applicant to engage in sexual activity with her even though it made her uncomfortable *is more believable* than the evidence supporting Applicant's guilt listed above."[1] This, according to the judge, is consistent with Pennington's decision to wait two months to report the assault, Benavides's version of the events, and that the parties reached a plea-bargain agreement for deferred adjudication. The trial judge opined that he was

---

[1] Emphasis in original.

"bothered greatly" by Benavides's failure to testify at the hearing and determined that the only thing to persuade him about Benavides's innocence was Pennington's testimony. The judge questioned Pennington's credibility about her inability to recognize Benavides as her assailant because of Kowalik's testimony that Benavides was the one to drive Pennington home. The judge found that Pennington "does <u>not</u> believe"[2] that Benavides sexually assaulted her and that her statement that she was pressured by the detective in making her 2000 statement to be credible.

The trial judge, in his conclusions of law, determined that he "has difficulty saying that the newly discovered evidence supporting guilt, unquestionably establishes Applicant's innocence." The judge then stated,

> **However**, there is arguably another standard set forth in *Ex parte Brown*[3] that does not seem to carry the steep burden. In *Ex parte Brown*, the Court stated that 'to succeed in an actual innocence claim, the applicant must show by clear and convincing evidence that, **despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence**.

> **When faced with that standard, this Court concludes that the newly discovered evidence does clearly and convincingly show, despite the evidence of guilt that supports the conviction *that no reasonable juror would have found applicant guilty in light of the new evidence*.**[4]

**Law**

---

[2] Emphasis in original.

[3] 205 S.W.3d 538 (Tex. Crim. App. 2006).

[4] Emphasis in original.

The Due Process Clause to the United States Constitution bars the incarceration of an innocent person.[5] A bare claim of actual innocence, based on newly discovered evidence, is cognizable on habeas, regardless of whether the applicant's conviction was the result of jury trial, guilty plea, or plea of nolo contendere.[6] To establish a bare innocence claim, an applicant must prove "by clear and convincing evidence that no reasonable juror would have convicted him in light of the new evidence."[7] An applicant must overcome the presumption that the conviction was obtained without error.[8]

When confronted with a bare actual-innocence claim, courts must "assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole . . . by weigh[ing] such exculpatory evidence against the evidence of guilt . . . ."[9] Thus, taking into account the credibility of witnesses, courts must weigh the newly available evidence against the old inculpatory evidence to determine if the new evidence unquestionably establishes the applicant's innocence.[10]

---

[5] *Ex parte Elizondo*, 947 S.W.2d 202, 204-05 (Tex. Crim. App. 1996).

[6] *Ex parte Brown*, 205 S.W.3d at 544-46 (citing *Ex parte Tuley*, 109 S.W.3d 388 393-96 (Tex. Crim. App. 2002)); *see also* TEX. CODE CRIM. PROC. art. 27.02 § 5 (a plea of nolo contendere has the legal effect of a guilty plea).

[7] *Ex parte Elizondo*, 947 S.W.2d at 209.

[8] *Ex parte Brown*, 205 S.W.3d at 545.

[9] *Ex parte Elizondo*, 947 S.W.2d at 206.

[10] *Ex parte Brown*, 205 S.W.3d at 546.

As the original factfinder in habeas proceedings, we are not bound by a trial judge's findings, but in most circumstances, we will defer to a judge's findings when they are supported by the record.[11]  But

> [w]hen our independent review of the record reveals findings and conclusions that are unsupported by the record, we will, understandably, become skeptical as to the reliability of the findings and conclusions as a whole.  In such cases, we will proceed cautiously with a view toward exercising our own judgment.  And when we deem it necessary, we will enter alternative or contrary findings and conclusions that the record supports.  Furthermore, when we determine that the trial judge's findings and conclusions that are supported by the record require clarification or supplementation, we may exercise our judgment and make findings and conclusions that the record supports and that are necessary to our independent review and ultimate disposition.[12]

**Analysis**

In this case, we conclude that it is necessary to exercise our original factfinding authority with respect to the credibility of Pennington's testimony at the habeas hearing.  The record does not support the trial judge's finding that Pennington's testimony about her sexual encounter with Benavides or the circumstances under which she made her 2000 statement to the Sheriff's Department are credible.  Next, our review of the record from the hearing and the trial judge's conclusions of law reveals that the trial judge was somewhat confounded by our decision in *Ex parte Brown*.  There is one standard for bare actual innocence habeas

---

[11]  *Ex parte Reed*, 271 S.W.3d 698, 727 (Tex. Crim. App. 2008) (citing *Ex parte Young*, 418 S.W.2d 824, 829 (Tex. Crim. App. 1967); *Ex parte Adams*, 768 S.W.2d 281, 288 (Tex. Crim. App. 1989); *Ex parte Van Alstyne*, 239 S.W.3d 815, 817 (Tex. Crim. App. 2007) (per curiam)).

[12]  *Id*. at 727-28.

claims, and the trial judge erred in concluding that *Ex parte Brown* announced a second, less-stringent standard that would entitle Benavides to relief under the facts of this case.

Turning to the trial judge's credibility finding about Pennington's testimony, we find his credibility determination under these circumstances to be unwarranted. On the state of the record, we are hard pressed to find her testimony credible. Initially, Benavides based his actual innocence claim on Pennington's inability to recognize Benavides as her assailant at the revocation hearing, approximately eight years after the assault occurred. At first, Pennington testified that she had indeed been sexually assaulted, but that Benavides was not the person who assaulted her. She also claimed that the detective pressured her to sign the 2000 accusing Benavides of sexually assaulting her and that she was told to pick someone out of the photo line-up. Pennington's position changed drastically when she became aware of Kowalik's presence in the courtroom. Inexplicably, after Benavides's attorney invoked the rule and Kowalik left the courtroom, Pennington asserted, for the first time, that the sexual encounter with Benavides was consensual, though her understanding of consensual is more or less mistaken. Pennington laughed on two occasions when directly challenged by the prosecutor on the issue of consent and then answered evasively by claiming that she could not remember. Additionally, Pennington wavered on the issue of consent, stating that she consented and also stating that she did not want to be involved in having sex with Benavides. Significantly, Pennington became evasive and contradictory throughout her testimony when she was questioned about her recollection of the assault, her interview with

the Sheriff's Department, and her role in the prosecution of the case. As a result, we cannot conclude that her testimony on the issue of consent and the authenticity and accuracy of her 2000 signed statement to the Sheriff's Department is credible. Thus, although we are presented with only a cold-record, we cannot agree with the trial judge's determination that Pennington's testimony about Benavides is credible and believable.

Next, we turn to the trial judge's confusion with the standard applicable to bare actual-innocence claims. In *Brown*, we explained the requirements of the bare-actual-innocence standard in two ways. First, citing our prior decisions in *Ex parte Tuley* and *State ex. rel. Holmes v. Third Court of Appeals*, we said that "an applicant must show 'by clear and convincing evidence, that despite the evidence of guilt that supports the conviction, no reasonable juror would could have found the applicant guilty in light of the new evidence.'"[13] And then, in the next sentence, we stated, "This showing must overcome the presumption that the conviction is valid and it must unquestionably establish applicant's innocence."[14] These two statements explain the one standard for bare-actual-innocence claims; they do not set out two, alternate and separate requirements. If an applicant does not unquestionably establish innocence, then the applicant has failed to prove that no reasonable juror could have found the applicant guilty in light of the new evidence, and vice-versa.

---

[13] *Ex parte Brown*, 205 S.W.3d at 545 (citing *Ex parte Tuley*, 109 S.W.3d at 392; *State ex rel. Holmes v. Third Court of Appeals*, 885 S.W.2d 389, 398 (Tex. Crim. App. 1994)).

[14] *Id.* (citing *Ex parte Tuley*, 109 S.W.3d at 392).

While a guilty plea or plea of nolo contendere does not prevent an applicant from seeking habeas relief under our actual innocence jurisprudence, such a plea, along with the with any evidence entered, or stipulation to the evidence,[15] supporting the plea, must be considered in weighing the old evidence against the new evidence.[16] Benavides entered a knowing and voluntary plea of nolo contendere to the charge of sexual assault. Even though Benavides admitted only that he "played around" with Pennington and denied having sexual intercourse with her to the supervision officer responsible for compiling the PSI, as part of his plea, Benavides agreed that the facts alleged in the indictment charging sexual assault were true and correct. Benavides also agreed to allow the State to introduce documentary evidence supporting his guilt, which included Exhibit 1. Exhibit 1 contained the Sheriff Department's report detailing Pennington's allegation and the Department's investigation into the case. The narrative about the assault, as chronicled by the Sheriff's Department, is consistent with Pennington's signed statement in 2000. The dissent's alleged problem with the conflict between the charged offense and the evidence supporting it is without merit.[17] The offense of sexual assault always involves submission and participation through

---

[15] *See* TEX. CODE CRIM. PROC. ANN. art. 1.15.

[16] *See Ex parte Tuley*, 109 S.W.3d at 391 ("Convicting courts should also give great weight respect to knowing, voluntary, and intelligent pleas of guilty."), 392 ("A convicting court is not free to ignore a guilty plea when reviewing a collateral attack."); *see also* TEX. CODE CRIM. PROC. art. 1.15.

[17] Post at 11.

violence.[18] Consequently, the evidence presented in support of Benavides's actual innocence claim does not overcome his knowing and voluntary plea and the resulting presumptively valid conviction.[19]

Here, we agree with the trial judge's first inclination that the evidence presented on habeas does not unquestionably establish Benavides's innocence. Having been presented with a recantation that is not credible, we conclude that Benavides has not sustained his burden—the new evidence of innocence does not clearly and convincingly outweigh the old evidence supporting his conviction. Therefore, contrary to the trial judge's conclusion, Benavides has not shown by clear and convincing that no reasonable juror would have found him guilty.

## Conclusion

We hold that Benavides has failed to show that he is actually innocent of sexual assault by clear and convincing evidence. Therefore, we deny relief.

DATE DELIVERED: May 26, 2010
DO NOT PUBLISH

---

[18] *Wisdom v. State*, 708 S.W.2d 840, 845 (Tex. Crim. App. 1986) (rape constitutes a crime of violence per se).

[19] *See Breazeale v. State*, 683 S.W.2d 446, 450-51 (Tex. Crim. App. 1985) (op. on reh'g) (The trial court's judgment is presumed to be truthful and should not be disregarded) (citing *Ex parte Morgan*, 412 S.W.2d 657 (Tex. Crim. App. 1967)).