WR-50,961-07
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/6/2015 4:03:06 PM
Accepted 3/6/2015 4:17:38 PM
ABEL ACOSTA
CLERK

No. WR-50, 961-07

IN THE

# Court of Criminal Appeals of Texas

EX PARTE RODNEY REED,

*Applicant,*

## STATE'S MOTION TO DISMISS APPLICATION FOR WRIT OF HABEAS CORPUS AS ABUSIVE

BRYAN GOERTZ
Criminal District Attorney
Bastrop County, Texas

MATTHEW OTTOWAY
Assistant Attorney General/
Assistant District Attorney
Bastrop County, Texas
Texas Bar No. 24047707

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
Email: *matthew.ottoway@texasattorney
general.gov*

*Attorneys for the State*

## MOTION TO DISMISS APPLICATION FOR WRIT OF HABEAS CORPUS AS ABUSIVE

Applicant Rodney Reed is a Texas inmate convicted and sentenced to death for the abduction, rape, and murder of Stacey Stites. On February 18, 2015—little more than two weeks before his then-scheduled execution of March 5, 2015—Applicant filed his seventh (sixth subsequent) state habeas application in the trial court. 1.SHCR-07, at 8–.[1] On February 23, 2015, this Court stayed Applicant's execution by order issued in Applicant's seventh state habeas proceeding. Order, No. WR-50,961-07 (Tex. Crim. App. Feb. 23, 2015). The State asks that this subsequent application be dismissed as abusive.[2]

## I. Applicant's litigation history

A jury found Applicant guilty of capital murder for abducting, raping, and strangling to death Stacey Stites, and he was sentenced to

---

[1] "SHCR-07" refers to the clerk's record for Applicant's seventh state habeas proceedings. The references are preceded by volume number and followed by page numbers.

[2] To be clear, the State is not challenging the Court's recently-issued stay order. The State is merely requesting that, when the Court considers Applicant's seventh state habeas application in due course, the Court find that Applicant has not overcome the applicable procedural barriers to merits review and that Applicant's present application be dismissed on procedural grounds.

death on May 30, 1998. 1.CR.489–493.[3] Applicant's conviction was affirmed on direct appeal by this Court on December 6, 2000, *Reed v. State*, No. 73,135 (Tex. Crim. App. Dec. 6, 2000) (*Reed I*), and the Supreme Court of the United States denied Applicant a writ of certiorari later that next year, *Reed v. Texas*, 534 U.S. 955 (2001).

With direct appeal pending, Applicant filed an initial application for state habeas relief on November 15, 1999. 2.SHCR-01/02, at 2–251.[4] A little more than a year later, Applicant filed a "supplemental claim." 3.SHCR-01/02, at 391–402. On February 13, 2002, this Court denied Applicant's initial application on findings by the trial court sitting in habeas and found the "supplemental claim" to be a subsequent application and dismissed it as abusive. *Ex parte Reed*, Nos. 50,961-01, 50,961-02 (Tex. Crim. App. Feb. 13, 2002) (*Reed II*).

Applicant turned to federal court on February 13, 2003, filing a petition for writ of habeas corpus in the Western District of Texas, Austin Division. Petition for a Writ of Habeas Corpus, *Reed v. Thaler*, No. A-02-

---

[3] "CR" refers to the clerk's record for Applicant's capital murder trial. The references are preceded by volume number and followed by page numbers.

[4] "SHCR-01/02" refers to the clerk's record for Applicant's first and second state habeas proceedings. The references are preceded by volume number and followed by page numbers.

CV-142-LY (W.D. Tex. Sept. 26, 2012). The case was stayed and placed in abeyance on March 1, 2004, so that Applicant could exhaust certain claims through the state system. Order, Mar. 1, 2004, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012). As described in more detail below, Applicant thereafter proceeded to file four additional state habeas applications.

On March 29, 2005, Applicant filed his third state habeas application. 1.SHCR-03, at 2–343.[5] On October 19, 2005, this Court dismissed all of Applicant's claims as abusive, with the exception of two claims that were remanded to the trial court for factual development. *Ex parte Reed*, No. WR-50961-03, 2005 WL 2659440, at *1 (Oct. 19, 2005) (*Reed III*). After a live evidentiary hearing and findings from the trial court, this Court issued an exhaustive opinion denying relief and finding that Applicant's gateway-innocence claim was not persuasive enough to overcome the untimeliness of his procedurally defaulted claims. *Ex parte Reed*, 271 S.W.3d 698 (Tex. Crim. App. 2008) (*Reed IV*).

---

[5]　"SHCR-03" refers to the clerk's record for Applicant's third state habeas proceeding. The references are preceded by volume number and followed by page numbers.

With his third state habeas application pending, Applicant filed his fourth and fifth state habeas applications on March 5, 2007, and July 16, 2008, respectively. SHCR-04, at 2–15;[6] SHCR-05, at 2–89.[7] Both of these applications were dismissed as abusive by this Court in a single opinion. *Ex parte Reed*, Nos. WR-50,961-04, WR-50,961-05, 2009 WL 97260, at \*1–6 (Tex. Crim. App. Jan. 14, 2009) (*Reed V*).

After those proceedings terminated, Applicant filed his sixth state habeas application on April 21, 2009. SHCR-06, at 2–59.[8] This, too, was dismissed as abusive by this Court. *Ex parte Reed*, No. WR-50961-06, 2009 WL 1900364, at \*1–2 (Tex. Crim. App. July 1, 2009) (*Reed VI*).

The stay in federal district court was lifted on August 20, 2009. Order, Aug. 20, 2009, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012). On June 12, 2012, a federal magistrate judge recommended denial of relief, Report and Recommendation of the United

---

[6]  "SHCR-04" refers to the clerk's record for Applicant's fourth state habeas proceeding. The references are preceded by volume number and followed by page numbers.

[7]  "SHCR-05" refers to the clerk's record for Applicant's fifth state habeas proceeding. The references are preceded by volume number and followed by page numbers.

[8]  "SHCR-06" refers to the clerk's record for Applicant's sixth state habeas proceeding. The references are preceded by volume number and followed by page numbers.

States Magistrate Judge, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012), which the federal district judge largely adopted, and who independently denied relief on September 26, 2012, Order on Report and Recommendation, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012). The federal district judge also denied or overruled all of Applicant's post-judgment filings on February 4, 2013. Order, Feb. 4, 2013, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012).

Applicant then appealed the denial of federal habeas relief, but the Court of Appeals for the Fifth Circuit affirmed on January 10, 2014. *Reed v. Stephens*, 739 F.3d 753 (5th Cir. 2014) (*Reed VII*). On March 19, 2014, the same court also rejected Applicant's attempts at rehearing without the necessity of an internal poll. On Petition for Rehearing and Rehearing En Banc, *Reed v. Stephens*, 739 F.3d 753 (5th Cir. 2014) (No. 13-70009). The Supreme Court of the United States denied Applicant's petition for writ of certiorari from this proceeding on November 3, 2014. *Reed v. Stephens*, 135 S. Ct. 435 (2014).

On February 18, 2015,[9] slightly more than two weeks before his then-scheduled execution, Applicant filed his seventh state habeas application. 1.SHCR-07, at 8–84. On February 23, 2015, this Court stayed Applicant's execution via an order issued in Applicant's seventh state habeas proceeding. Order, No. WR-50,961-07 (Tex. Crim. App. Feb. 23, 2015). Applicant's seventh habeas application is now pending before the Court. [10]

## II.    Evidence at Applicant's trial

Stacey Stites was a happily-engaged nineteen-year-old just eighteen days shy of her wedding. 43.RR.81–82, 85. She lived in an apartment complex with her police-officer fiancé, Jimmy Fennell, and her mother, Carol, who lived in an apartment below Stites's, and with whom Stites spent her last days alive planning her upcoming nuptials. 43.RR.81; 44.RR.51.

---

[9]     Applicant originally filed his seventh application on February 13, 2015, but did not attach any exhibits; the "original" seventh application is not in the clerk's record, however. On February 18, 2015, Applicant filed his "corrected" seventh application with the exhibits. 1.SHCR-07, at 8–84; 2.SHCR-07, at 92–255; 3.SHCR-07, at 261–437.

[10]     Applicant also filed a Chapter 64 motion in the trial court for additional DNA testing and the appeal from that proceeding is also currently pending before the Court. *See generally Reed v. State*, No. AP-77,054 (Tex. Crim. App.).

Stites worked at a HEB grocery store in Bastrop, Texas—the store was about thirty miles from her residence in Giddings, Texas—and was scheduled for a 3:30 a.m. shift on April 23, 1996. 43.RR.95; 44.RR.48. When she did not show, a fellow employee became worried and eventually called Carol around 6:30 a.m. 43.RR.96, 101–02. In turn, Carol called Fennell, and he went to look for Stites while Carol informed authorities about Stites's absence from work. 44.RR.70–71.

Before Carol knew about Stites's disappearance, a Bastrop police officer had, at 5:23 a.m., discovered the pickup truck Stites took to work— Fennell's red, compact truck—seemingly abandoned in a local high school parking lot. 43.RR.117. Because the truck was not reported stolen, the officer took no further action. 43.RR.118,122. Before he left, however, he noticed a piece of a belt lying outside the truck. 43.RR.120.

Later that day, Stites's body was found off a rural road. 44.RR.18, 21. Texas Department of Public Safety (DPS) crime laboratory personnel processed the scene. 44.RR.108. They observed a partially clothed Stites—her shirt removed, bra exposed, and missing a shoe and an earring. 44.RR.113. Her pants were undone, the zipper broken, and her panties were bunched at her hips. 44.RR.113–14, 122. She was

7

discovered with work apparel—a nametag and a large knee brace. 44.RR.128, 151. On the side of the road was another piece of belt. 44.RR.115.

Because of obvious signs of rape, a DPS criminalist took vaginal and breast swabs from Stites's body. 44.RR.123; 45.RR.51. On-site chemical testing of a vaginal swab signaled the presence of semen. 44.RR.124–27. Around 11:00 p.m. that night, microscopic analysis showed the presence of intact sperm, which indicated recent seminal deposit—based on scientific articles, sperm remains whole within the vaginal cavity for usually no longer than twenty-six hours. 44.RR.131; 45.RR.15–16.

Later forensic testing matched the belt fragments to each other, and it appeared that the belt was torn apart, not cut, 47.RR.83–85, and Fennell identified the belt as Stites's, 45.RR.102. A search of the truck by DPS criminalists yielded Stites's missing shoe and earring, and the remnants of a smashed, plastic drinking glass. 47.RR.44–45; 49.RR.34, 38. Additionally, the driver's-side seatbelt was still engaged and the seat was angled in such a way that a 6'2" person could properly utilize the rearview mirror. 46.RR.101; 49.RR.43.

Stites's body was autopsied the next day by Dr. Roberto Bayardo. 48.RR.111. He observed a large mark across Stites's neck that matched the pattern of her belt. 48.RR.119–20, 136–37. There were bruises on Stites's arms consistent with forcible restraint, bruises on her head consistent with the knuckles of a fist, and bruises on her left shoulder and abdomen consistent with an over-the-shoulder seat belt. 48.RR.115–18. Based on physical changes in the body, Dr. Bayardo estimated Stites's time of death to be 3:00 a.m., give or take four hours. 48.RR.113–14.

Dr. Bayardo also took vaginal swabs, in addition to oral and rectal swabs. 48.RR.121–23. He too observed intact sperm from a vaginal swab, which he stated indicated "quite recent[]" seminal deposit. 48.RR.121–22. There were also injuries to Stites's anus, including dilation and lacerations. 48.RR.126. These were consistent with penile penetration inflicted at or near the time of Stites's death—or peri-mortem. 48.RR.126–27. And, Dr. Bayardo, via microscopic analysis, thought he saw sperm heads from a rectal swab, though he acknowledged that chemical testing was negative for semen from this swab. 48.RR.123–24. He noted, however, that sperm break down quicker in the rectal

9

cavity than in the vaginal cavity, so the fragmented sperm further indicated recent seminal deposit. 48.RR.125.

Thereafter, DPS personnel conducted DNA testing on the vaginal, rectal, and breast swabs, and the results indicated that the foreign DNA came from a single source. 49.RR.95–113. They also "mapped" Stites's panties, which showed little movement after semen was deposited in her vaginal cavity. 44.RR.190–91; 55.RR.40. This, too, demonstrated seminal deposit just before her murder. 55.RR.41.

For approximately a year, law enforcement—state, county, and municipal—searched for Stites's killer to no avail. They interviewed hundreds and obtained biological samples from twenty-eight males; none matched the foreign DNA in and on Stites. 46.RR.111–12; 49.RR.114–19. And none mentioned Applicant associating with Stites. 46.RR.112.

Applicant became a suspect in Stites's murder after he was arrested for kidnapping, beating, and attempting to rape and murder another nineteen-year-old woman, Linda Schlueter. 46.RR.122.[11] Schlueter was abducted by Applicant approximately six months after Stites's murder,

---

[11] The specific facts of Schlueter's abduction, assault, and attempted rape and murder was not revealed to the jury until the punishment phase of trial.

10

near both the route Stites typically took to work and the time she disappeared—3:00 a.m. 61.RR.10, 37–47. Moreover, Applicant was regularly seen in this area by Bastrop police officers in the early morning hours, and his home was close to where both Stites's and Schlueter's vehicles were abandoned. 50.RR.70–73, 80, 95–96. Further, Applicant's height—6'2"—aligned with the angle of the driver's seat. 49.RR.43.

Given these similarities, law enforcement inquired with DPS if they had Applicant's DNA profile (this was pre-CODIS); they did because Applicant had raped a mildly intellectually disabled woman, Caroline Rivas. 46.RR.122–23.[12] Applicant's DNA profile was compared to the foreign DNA inside and on Stites's body and the two were consistent. 50.RR.104. Applicant was then questioned and he repeatedly denied knowing Stites. 48.RR.82–83. Additional biological samples were taken from Applicant pursuant to a search warrant. 48.RR.18, 86–92.

More DNA testing was performed by DPS and a private laboratory on the new samples from Applicant and those taken from Stites's body. 49.RR.118–19; 50.RR.120–36, 140; 49.RR.127; 51.RR.33–34. The results

---

[12] Again, the underlying facts of Rivas's physical- and sexual-abuse were not provided to the jury until the punishment phase of trial.

11

were conclusive—Applicant could not be excluded as the foreign DNA contributor but 99% of the world's population could be, and one would only expect to see the foreign DNA profile in one person in anywhere from 24 to 130 billion people. 49.RR.118, 122; 50.RR.144–45; 51.RR.80. But, just to be sure, samples were taken from Applicant's father and three of his brothers, and they were ruled out as contributors too. 49.RR.123–25

Applicant's trial counsel attempted to counter this damning evidence with a two-pronged attack—they tried to blame someone else for the murder, and they argued that Applicant and Stites were engaged in a clandestine but consensual, sexual relationship.

To prove the former, Applicant's DNA expert testified that a hair found on Stites's back did not match any of the samples gathered by law enforcement, and a couple of witnesses testified that they saw a white truck with three men in it near the area where Stites's body was recovered. 51.RR.107–08, 124–25; 54.RR.50–52. The latter witnesses' testimony was significantly impeached. 51.RR.115, 119, 128–29.

Trial counsel also suggested that Fennell was the murderer. Law enforcement interviewed Fennell several times and collected biological samples from him, but they never searched his apartment. 45.RR.110–

12; 46.RR.62. Fennell was eventually cleared after law enforcement investigated, and ruled impossible, Fennell's ability to travel to Bastrop, murder Stites, and return home for Carol's phone call within the known timeframes and without any sort of transportation. 46.RR.127.

Further still, trial counsel cast suspicion on David Lawhon, a Bastrop resident who murdered another woman, Mary Ann Arldt, two weeks after Stites's death. 46.RR.158. They called several witnesses that testified about a connection between Stites and Lawhon, including one who said Lawhon had confessed to killing Stites. 52.RR.29–31, 89. They were all greatly impeached—the confession witness actually told police someone other than Lawhon had confessed to Stites's murder, Stites's good friends testified in rebuttal that Stites never dated Lawhon, and Lawhon's ex-wife testified that nothing unusual occurred around the time of Stites's murder, which was different than when Lawhon murdered Arldt. 52.RR.93; 54.RR.130, 138, 141–43.

As to the secret-relationship defense, one witness testified that she saw Stites and Applicant talking at the grocery store, and another said Stites came by Applicant's house looking for him. 51.RR.136; 53.RR.92. These were not credible accounts, however, as Applicant's family were

13

frequent guests at the first witness's bar, and the second witness initially said "Stephanie," not "Stacey," was looking for Applicant, and she did not identify Stites when shown her driver's license photo. 51.RR.138–39; 53.RR.92–93. The jury found Applicant guilty of two counts of capital murder. *See also Reed IV*, 271 S.W.3d at 702–12 (providing an extensive recitation of the facts from Applicant's trial).

## ARGUMENT

### I.  The standards for subsequent applications.

A court may not consider the merits of a subsequent state habeas application "*except* in exceptional circumstances." *Ex parte Kerr*, 64 S.W.3d 414, 418 (Tex. Crim. App. 2002); Tex. Code Crim. Proc. art. 11.071 § 5(a). Section 5(a)—the "abuse-of-the-writ" bar—was enacted to hasten postconviction review and discourage piecemeal litigation. *Id.* at 418–19. In other words, "none of this 'every week you file a new petition' which is basically what happens." *Id.* at 419 (citation omitted). Thus, an applicant must file an application which "contains sufficient specific facts establishing," Tex. Code Crim. Proc. art. 11.071 § 5(a), one of these "exceptional circumstances," *Ex parte Kerr*, 64 S.W.3d at 418.

First, an applicant can prove either factual or legal unavailability of the claim. Tex. Code Crim. Proc. art. 11.071 § 5(a)(1). This requires

proof of unavailability during *all* prior state habeas applications. *See Ex parte Campbell*, 226 S.W.3d 418, 421 (Tex. Crim. App. 2007) ("[T]he factual or legal basis for an applicant's current claims must have been unavailable as to all of his previous applications."). Legal unavailability occurs when a claim "was not recognized or could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state." Tex. Code Crim. Proc. art. 11.071 § 5(d). In addition, an applicant must also make a prima facie showing of facts sufficient to invoke the new law. *See Ex parte Brooks*, 219 S.W.3d 396, 400 (5th Cir. 2007). This makes sense because,

> [t]o read the statute otherwise would mean that every time a new law is passed or precedent is set, every inmate could file a subsequent application for writ of habeas corpus, regardless of whether the newly available legal basis applied to his situation, and the court would have to consider the merits. This clearly undermines the purpose of the subsequent-writ provisions.

*Id*. at 400. To prove factual unavailability, an applicant must demonstrate that the factual basis of the claim "was not ascertainable through the exercise of reasonable diligence." Tex. Code Crim. Proc. art. 11.071 § 5(e).

Second, an applicant can prove that "but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt." Tex. Code Crim. Proc. art. 11.071 § 5(a)(2). This requires an applicant to "make a threshold, prima facie showing of innocence by a preponderance of the evidence." *Reed IV*, 271 S.W.3d at 733 (citation omitted). Innocence in this context is not a freestanding claim, but a procedural one "that does not provide a basis for relief, but is tied to a showing of constitutional error at trial." *Ex parte Franklin*, 72 S.W.3d 671, 675 (Tex. Crim. App. 2002). A "claim" of this sort is also known as a "*Schlup*-type claim," *id.*, because Section 5(a)(2) "was enacted in response to" *Schlup v. Delo*, 513 U.S. 298 (1995), *Reed IV*, 271 S.W.3d at 733.

Third, an applicant can prove that, "by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the [S]tate's favor one or more of special issues." Tex. Code Crim. Proc. art. 11.071 § 5(a)(3). Section 5(a)(3), "more or less, [codifies] the doctrine found in *Sawyer v. Whitley*, 505 U.S. 333 (1992)." *Ex parte Blue*, 230 S.W.3d 151, 151 (Tex. Crim. App. 2007).

## II. Applicant fails to prove entitlement to merits review of his claims.

Applicant appears to raise three claims. First, he raises a freestanding claim of innocence under *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996). 1.SHCR-07, at 18, 62–68. Second, he argues that new scientific evidence establishes his probable innocence under Article 11.073 of the Texas Code of Criminal Procedure. 1.SHCR-07, at 18, 68–75. And third, he asserts that the State presented "false, misleading, and scientifically invalid testimony" which, he claims, violates *Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. 2009). 1.SHCR-07, at 18, 75–82. Though not a claim, Applicant also asks that this Court to, in the alternative, reconsider its prior decisions regarding Applicant's multiple, previous applications. 1.SHCR-07, at 18, 82–83. While Applicant briefs the merits of these apparent claims, he fails to discuss Section 5 at all. That is not surprising because Applicant does not make a sufficient showing to overcome the abuse-of-the-writ bar. As a result, the Court should dismiss Applicant's seventh state habeas application.

### A. Applicant fails to prove that the Court may consider his freestanding-innocence claim.

A freestanding-innocence claim is also referred to as a "*Herrera*-type claim" based on *Herrera v. Collins*, 506 U.S. 390 (1993). *Ex parte*

17

*Franklin*, 72 S.W.3d at 674. "[A]n exceedingly high standard applies to the assessment of claims of actual innocence that are not accompanied by a claim of constitutional error at trial." *Ex parte Elizondo*, 947 S.W.2d at 209. Thus, an applicant "must show by *clear and convincing evidence* that no reasonable juror would have convicted him in light of the new evidence." *Id.* This "is a Herculean task." *Ex parte Brown*, 205 S.W.3d 538, 545 (Tex. Crim. App. 2006). And it requires that an applicant rely upon "'newly discovered' or 'newly available'" evidence in making his freestanding claim of innocence, meaning "[h]e cannot rely upon evidence or facts that were available at the time of his trial, plea, or post-trial motions." *Id.* Importantly, "[a] claim of actual innocence is not an open window through which an applicant may climb in an out of the courthouse to relitigate the same claim before different judges at different times." *Id.* 545–46.

1. **Applicant fails to address legal or factual unavailability and therefore forfeits his right to rely on such exceptions.**

Initially, the Court should dismiss Applicant's freestanding-innocence claim because he makes no argument that it overcomes the abuse-of-the-writ bar. The failure to adequately brief a point of error

18

results in forfeiture of the issue. *See Lucio v. State*, 351 S.W.3d 878, 896–97 (Tex. Crim. App. 2011). Thus, because Applicant does not even attempt to engage in the required showing for merits consideration of a claim in a subsequent application, this Court should summarily dismiss his freestanding-innocence claim.

In any event, Applicant cannot demonstrate that he overcomes Section 5(a)(1), the only arguably applicable exception to his freestanding-innocence claim.[13] To do this, Applicant must prove that the factual and legal bases of his claim were unavailable and that his *Herrera*-type claim is prima facie sufficient. He fails in this undertaking.

### 2. Applicant fails to prove legal unavailability.

Applicant does not prove that the legal basis of his freestanding-innocence claim was unavailable when he filed his initial application or any of his subsequent applications. This Court's recognition of the legal standard for freestanding-innocence claims predates Applicant's initial

---

[13] Section 5(a)(2) does not apply to Applicant's freestanding-innocence claim because Applicant does not raise "a claim of constitutional error at trial." *Ex parte Elizondo*, 947 S.W.2d at 209. In other words, a freestanding-innocence claim cannot use Section 5(a)(2) as a gateway to merits adjudication because a freestanding-innocence claim, a *Herrera*-type claim, requires a showing of innocence without constitutional error at trial while a *Schlup*-type claim is always accompanied with an alleged trial-level constitutional error. *See Ex parte Franklin*, 72 S.W.3d at 675.

Section 5(a)(3) does not apply to Applicant's freestanding-innocence claim because Applicant alleges actual innocence of his offense, not his sentence.

state habeas application. *Compare Ex parte Elizondo*, 947 S.W.2d at 205 (opinion issued December 18, 1996), *with* 1.SHCR-01, at 2–242 (initial application filed November 11, 1999). Indeed, Applicant has repeatedly asserted a freestanding claim of innocence, including in his initial application. *See, e.g.*, 1.SHCR-01, at 17–18. Thus, Applicant cannot overcome the abuse-of-the-writ bar for his freestanding-innocence claim based on legal unavailability.

### 3. Applicant fails to prove factual unavailability.

Applicant also does not prove that the facts he now asserts were unavailable at the time he filed his initial application or any thereafter. Applicant appears to rely on the following "new" evidence of "innocence:" opinions from three forensic pathologists, Drs. Spitz, Baden, and Riddick; "recantations" from two of the State's witnesses at Applicant's trial, Dr. Bayardo and Meghan Clement; and "observations" from two former coworkers of Sites, Alicia Slater and Lee Roy Ybarra. *See* 1.SHCR-07, at 62–68. None of this evidence was unavailable when Applicant filed his prior applications.

First, Applicant has had the assistance of a forensic pathologist for at least a decade. 1.SHCR-03, at 110–13 (Dr. Riddick's prior affidavit

20

appended to Applicant's third state habeas application).  And Applicant filed three more state habeas applications after first presenting Dr. Riddick's opinion to this Court.  Clearly, Applicant has had at his disposal a forensic pathologist for the last four of his prior state habeas applications.  Thus, Applicant surely cannot suggest that the factual basis of his freestanding-innocence claim was unavailable to him—he needed only to have asked his decade-long-retained forensic pathologist, Dr. Riddick.  Applicant, in failing to provide this information earlier despite having access to expert assistance, fails to prove reasonable diligence.  *Cf. Ex parte Smith*, 444 S.W.3d 661, 670 (Tex. Crim. App. 2014) ("A ten-and-a-half year delay is extraordinary.").

Second, there has been no recantation from Dr. Bayardo.  Indeed, two federal courts have agreed that Dr. Bayardo's affidavit differs only slightly from his trial testimony.  *See Reed VII*, 739 F.3d at 770 ("Dr. Bayardo's purported 'disavowal' of his trial testimony does not contradict much of his original testimony."); Order on Report and Recommendation 13, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012) ("Even if the court were to overlook [Applicant's] delay, it would conclude that Bayardo's affidavit has little probative value.").  And, as for Clement, her

email to Applicant states that her "testimony speaks for itself and can be argued on its own merit. Therefore, I won't be sending the affidavit/declaration." 2.SHCR-07, at 101. Thus, these "recantations" cannot be the basis of supposedly unavailable facts.

But, further, it is clear that even if these "recantations" were truly reflective of about-face changes, Applicant still fails to prove diligence in obtaining them. Applicant first offered Dr. Bayardo's affidavit to the federal district court after receiving an adverse report and recommendation from the federal magistrate judge. Order on Report and Recommendation 12, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012). The federal district judge found Applicant's "extraordinary delay" in presenting Dr. Bayardo's affidavit to be inexcusable, *id.* at 12–13, a determination upheld on appeal, *Reed VII*, 739 F.3d 769 n.5 ("[Applicant] has provided no persuasive reason for waiting well over a decade to revisit Dr. Bayardo's testimony."). Similarly, the federal district judge found the email from Clement to be untimely, Order 12–13, Feb. 4, 2013, *Reed v. Thaler*, No. A-02-CV-142-LY (W.D. Tex. Sept. 26, 2012), which was again upheld on appeal, *Reed VII*, 739 F.3d at 776 n.12 ("This evidence is untimely and does not lend

22

[Applicant] any support beyond that already provided by the affidavits of Dr. Bayardo and Dr. Riddick."). While these findings of untimeliness are not binding on this Court, they should be persuasive evidence that Applicant is engaging in piecemeal litigation. Indeed, it appears that Applicant simply had to ask Dr. Bayardo and Clement for their "new" opinions, *see* 2.SHCR-07, at 100 (Clement emailed Applicant), and could have done so at any time during Applicant's six prior state habeas applications. The failure to prove diligence—and the affirmative evidence demonstrating a lack thereof—means that Applicant cannot prove unavailable facts as to Dr. Bayardo and Clement. *Cf. Ex parte Smith*, 444 S.W.3d at 670.

Third, as to the HEB employees, Applicant has provided no evidence that they were unavailable during any of Applicant's prior state habeas proceedings. A witness testified at trial that she saw Applicant talking with Stites at HEB, 51.RR.136 (testimony of Julia Estes), and Applicant provided an affidavit in his first state habeas proceeding that he and Stites were seen together at HEB, 1.SHCR-01, at 233 (affidavit of Elizabeth Keehner, stating "it dawned on me that Stacy [sic] might be the girl Rodney was holding hands with at H.E.B."), though, these

23

witnesses were discredited for a variety of reasons. Accordingly, Applicant knew that HEB employees might be able to shed light on his supposedly preexisting, consensual relationship with Stites. Yet, Applicant has provided this Court with no evidence that he inquired with these employees to establish reasonable diligence. In fact, Applicant has provided no additional consensual-relationship witnesses to any court since his initial state habeas application terminated in 2002. Hence, Applicant has failed to demonstrate factual unavailability with respect to Slater and Ybarra. *Cf. Ex parte Smith*, 444 S.W.3d at 670.

At bottom, Applicant has had the means—attorneys, investigators, and experts—to obtain and present the "new" evidence he now provides, long ago. Waiting until the last minute—about two weeks from his then-existing execution date—is not reasonable diligence. Consequently, Applicant has failed to prove that the factual basis for his freestanding-innocence claim was unavailable.

### 4. Applicant fails to make a prima facie case of actual innocence.

Moreover, Applicant has also failed to make a prima facie case of freestanding innocence even if he could prove factual or legal unavailability. In order to prove a freestanding-innocence claim,

24

Applicant has to rely on newly available facts. *See Ex parte Brown*, 205 S.W.3d at 545. This requires evidence that "could not be known to [an applicant] even with the exercise of due diligence." *Id*. Thus, much of the above unavailability discussion dovetails with the newly-available requirement of a freestanding-innocence claim.

None of Applicant's forensic pathologists indicate that their opinions could not have been formed at the time of Applicant's trial. Accordingly, these opinions are not newly available. *See Ex parte Briggs*, 187 S.W.3d 458, 465 (Tex. Crim. App. 2005) (rejecting a claim of actual innocence based, in part, on trial court's findings that the medical evidence supporting an applicant's claim had been available at the time of trial). Moreover, as to Dr. Bayardo and Clement, they have not recanted their trial testimony which, in turn, means that there is nothing new about their recent statements. And, as to the HEB employees, there was testimony at Applicant's trial that he and Stites were seen together at HEB but this was obviously rejected by the jury. Even accepting as credible all of Applicant's "new" evidence, he has failed to prove that it is newly available for purposes of a freestanding-innocence claim, meaning he fails to make out a prima facie case of actual innocence. For this

reason, and because Applicant fails to prove factual and legal unavailability, the freestanding-innocence claim should be dismissed as failing to overcome the abuse-of-the-writ bar.

**B.** **Applicant fails to prove that he qualifies to proceed under Article 11.073.**

Article 11.073 provides an applicant with a potential remedy regarding "certain scientific evidence." Tex. Code Crim. Proc. art. 11.073. To take advantage of the statute, an applicant must prove that there is "relevant scientific evidence" that "was not available to be offered" at the applicant's trial or "contradicts scientific evidence relied on by the [S]tate at trial." Tex. Code Crim. Proc. art. 11.073(a)(1)–(2).

This requires an applicant to file a state habeas application "containing specific facts indicating that" the "relevant scientific evidence is currently available and was not available at the time of the [applicant's] trial because the evidence was not ascertainable through the exercise of reasonable diligence" and that the "scientific evidence" would be admissible under the Texas Rules of Evidence. Tex. Code Crim. Proc. art. 11.073(b)(1)(A)–(B). If those prerequisites are met, an applicant must show that, by a preponderance of the evidence, "had the scientific

26

evidence been presented at trial . . . the [applicant] would not have been convicted." Tex. Code Crim. Proc. art. 11.073(b)(2).

For purposes of the abuse-of-the-writ bar, an applicant can prove unavailability "if the claim or issue is based on relevant scientific evidence that was not ascertainable through the exercise of reasonable diligence by the [applicant] on or before the date on which the original application or a previously considered application, as applicable, was filed." Tex. Code Crim. Proc. art. 11.073(c). In considering whether the "relevant scientific evidence" was not ascertainable, a "court shall consider whether the scientific knowledge or method on which the relevant scientific evidence is based has changed since . . . the date on which the original application or a previously considered application, as applicable, was filed, for a determination made with respect to a subsequent application." Tex. Code Crim. Proc. art. 11.073(d)(1)–(2).

### 1. Applicant does not prove that there were facts unavailable to him.

Applicant does not even attempt to prove that there were facts unavailable for purposes of this claim. Thus, the Court should find this argument to be waived. *See Lucio*, 351 S.W.3d at 896–97. And, as discussed above, so far as his "facts" are based on forensic pathology, he

has had the assistance of a forensic pathologist for over a decade. *See supra* Argument(II)(A)(2). He cannot demonstrate factual unavailability and it should not be a basis for overcoming the abuse-of-the-writ-bar.

### 2. Applicant fails to make a prima facie showing of a change in scientific knowledge or method.

Applicant tries to partake of Article 11.073 by claiming that Dr. Bayardo has changed his opinion. 1.SHCR-07, at 69–73. But, as explained above, Dr. Bayardo has not actually changed his opinion from the time of trial. Thus, even assuming that an expert's change of heart is sufficient to invoke Article 11.073, *see Ex parte Robbins*, No. WR-73,484-02, 2014 WL 6751684, at *10 (Tex. Crim. App. Nov. 26, 2014), *reh'g filed* (Tex. Crim. App. Dec. 18, 2014),[14] Dr. Bayardo's affidavit is insufficient to fall within Article 11.073's ambit. A point-by-point analysis of Dr. Bayardo's affidavit shows why.

At trial, Dr. Bayardo estimated that Stites, "[b]ased on changes that occur after death in the body," died "around 3:00 a.m. on April 23, 1996." 48.RR.113–14. Dr. Bayardo made clear that time of death was an educated guess because there is "not a precise scientific way of making a

---

[14] The State, here, adopts the arguments of the State's motion for rehearing in *Ex parte Robbins*, in that an expert's re-evaluation of their prior opinion is insufficient to prove a change in scientific knowledge or method.

28

determination of the time of death, we can only make estimates." 48.RR.113. In his affidavit, Dr. Bayardo says his "estimate of time of death, again, was only an estimate." 2.SHCR-07, at 96. He also states that "pinpointing a precise time of exactly when Ms. Stites died would have been, and remains, impossible." 2.SHCR-07, at 96. There is nothing different in Dr. Bayardo's affidavit than what he testified to, and it certainly does not demonstrate a reversal of opinion.

Dr. Bayardo testified that the discovery of morphologically intact spermatozoa—heads with attached tails—indicated "that this semen was placed in the vagina quite recently." 48.RR.121–22. On cross-examination, trial counsel noted that Dr. Bayardo had found "there were few spermatozoa [with] heads and tails" and clarified with Dr. Bayardo that this meant that "intercourse happened a day or two before the exam." 48.RR.144. Dr. Bayardo now states, "in my professional opinion, the spermatozoa I found in Ms. Stites's vaginal cavity *could* have been deposited days before her death." 2.SHCR-07, at 96 (emphasis added). Again, Dr. Bayardo's testimony is in accord with his affidavit and, again, this is not a reversal of opinion.

In Dr. Bayardo's testimony at trial, he stated that chemical testing of the rectal swabs from Stites's body "was reported as negative," although "[t]here was a little bit of a reaction but not enough to call it positive." 48.RR.123. Upon microscopic examination of slides created from the rectal swabs, Dr. Bayardo saw "several spermatozoa heads, but because they were no longer attached to the tails, or the tails were not visible, it was reported as negative." 48.RR.124. And, on cross-examination, Dr. Bayardo agreed that "other biological material" could look like sperm heads and said that "it's not possible to be a hundred percent sure that there is sperm there." 48.RR.146. In his affidavit, Dr. Bayardo affirmed that he testified in the manner above and reiterated that he "reported the smear[-slides] as negative on the autopsy report." 1.SHCR-07, at 97. Dr. Bayardo's affidavit on this topic is no different than his trial testimony and, thus, Applicant fails to prove withdrawal of his opinion.

As to sexual-organ injuries, Dr. Bayardo testified that he saw no injuries to Stites's vagina but he saw dilation and lacerations of Stites's anus that he concluded were peri-mortem. 48.RR.125–27. On cross-examination, Dr. Bayardo was asked if he contended that "the presence

30

of sperm . . . is a result of non-consensual sexual intercourse." 48.RR.145. Dr. Bayardo answered "[n]o," and clarified that the peri-mortem injuries *combined* with the presence of sperm caused him to state that the sexual intercourse was non-consensual. 48.RR.145. Dr. Bayardo, in his affidavit, notes that there were no injuries to "Stites's vaginal cavity" and reaffirms that "Stites was sexually assaulted in her anal cavity." 2.SHCR-07, at 97–98. Once again, Dr. Bayardo's affidavit is not an about-face of his trial testimony.

Because Dr. Bayardo has not changed his opinion, Applicant cannot show any change sufficient to invoke the process of Article 11.073. And, to the extent that Applicant asks this Court to consider Drs. Spitz and Baden's affidavits under Article 11.073, *see* 1.SHCR-07, at 73–74, those affidavits are entirely devoid of assertions that there has been any change in the "scientific knowledge or method" of forensic pathology as it applies to the issues Applicant now raises. As such, Applicant has failed to make a prima facie showing that there has been a change in the "scientific knowledge or method" since his last (or any) state habeas application. Tex. Code Crim. Proc. art. 11.073(c). His claim must be dismissed as a result.

31

**C. Applicant fails to prove that his false-evidence claims can be considered on the merits.**

This Court has recognized a due-process violation when the State unknowingly uses false evidence. *See, e.g., Ex parte Ghahremani*, 332 S.W.3d 470, 478 (Tex. Crim. App. 2011). An applicant must first prove that the evidence he or she challenges is false. *Id*. at 477. If an applicant makes this showing, the applicant must then prove that, by a preponderance of the evidence, "the error contributed to his conviction or punishment." *Ex parte Napper*, 322 S.W.3d 202, 242 (Tex. Crim. App. 2010).

**1. Applicant does not discuss any exception to the abuse-of-the-writ bar and, therefore, he should not be permitted to rely on them.**

At the outset, the Court should dismiss Applicant's unknowing-use-of-false-evidence claim because he does not provide any briefing on overcoming the abuse-of-the-writ bar. Inadequately briefed points of error results are considered forfeited. *See Lucio*, 351 S.W.3d at 896–97. Thus, because Applicant fails to engage in the required showing for merits consideration of a claim in a subsequent application, this Court should summarily dismiss his unknowing-use-of-false-evidence claim.

## 2. Applicant fails to prove legal unavailability.

As stated above, in order to prove legal unavailability, an applicant must prove that the legal rule "was not recognized or could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state." Tex. Code Crim. Proc. art. 11.071 § 5(d). Applicant fails to make this showing.

On December 9, 2009, this Court handed down *Ex parte Chabot*, which held that the State's unknowing use of false evidence could violate the Due Process Clause. 300 S.W.3d at 769. This case was handed down after the last of Applicant's prior subsequent applications was dismissed. Nonetheless, *Ex parte Chabot*'s legal foundation was decided before Applicant filed his fourth, fifth, and sixth state habeas applications.

In *Ex parte Chabot*, this Court explicitly held that "[*b*]*ased on our decision in* [*Ex parte*] *Carmona*, [185 S.W.3d 492 (Tex. Crim. App. 2006),] we agree with the convicting court that the circumstances of the present case merit a finding that the applicant's due-process rights were violated, notwithstanding the absence of the State's knowledge of the perjured testimony at the time of trial." 300 S.W.3d at 772 (emphasis added). By

33

relying upon *Ex parte Carmona*, which was decided on March 1, 2006, to find a due-process violation in *Ex parte Chabot*, the Court was necessarily "agree[ing]" that the legal basis of an unknowing-use-of-false-evidence claim "could . . . have been reasonably formulated from a final decision of . . . a court of appellate jurisdiction of this state." Tex. Code Crim. Proc. art. 11.071 § 5(d); *but see Ex parte Chavez*, 371 S.W.3d 200, 206–07 (Tex. Crim. App. 2012) (holding that *Ex parte Chabot* was a new legal basis).

Moreover, holdings from the United States Court of Appeals for the Second Circuit prove that the unknowing-use-of-false-testimony claim could "have been reasonably formulated from a final decision of . . . a court of appeals of the United States." Tex. Crim. Proc. art. 11.071 § 5(d). For example, in *Ortega v. Duncan*, the Second Circuit granted federal habeas relief when the inmate proved that "eyewitness" testimony presented at his trial was false. 333 F.3d 102, 104 (2d Cir. 2003). It summarized the law as follows:

> We have held that a showing of perjury at trial does not in itself establish a violation of due process warranting habeas relief. Instead, when false testimony is provided by a government witness without the prosecution's knowledge, due process is violated only "if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'"

*Id.* at 108 (alteration in original) (footnotes omitted) (quoting *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991)). This standard is practically indistinguishable from *Ex parte Chabot*. In *Ex parte Chabot*, it did not matter whether prosecutors knew the falsity of the evidence, just like in *Ortega*. And in *Ex parte Chabot*, the Court adopted a "more likely than not" standard, virtually identical to the "most likely" standard used in *Ortega*. It is beyond clear that the legal basis of *Ex parte Chabot* could have been formulated by "a court of appeals of the United States" at least as early as June 17, 2003, and most likely well before that date, which means it could have been formulated, at the very least, before Applicant's third, fourth, fifth, and sixth state habeas applications. *But see Ex parte Chavez*, 371 S.W.3d at 206–07. Thus, Applicant cannot rely on an unknowing-use-of-false-evidence claim as an unavailable legal basis.

### 3. Applicant fails to prove factual unavailability.

The same analysis for purposes of Applicant's freestanding-innocence claim applies here—none of Applicant's "new" "facts" were out of his reach had he simply used reasonable diligence. *See supra* Argument II(A)(3). In short, Applicant has had the assistance of a

35

forensic pathologist for over a decade and his latest forensic-pathology-related affidavits do not indicate that they are based on recent advances in medical science. *See supra* Argument II(A)(3). Applicant, therefore, cannot rely upon factual unavailability to overcome the abuse-of-the writ bar.

### 4. Applicant does not prove gateway innocence or innocence of his death sentence nor does he make a prima facie case of unknowing use of false evidence.[15]

This Court has previously considered and extensively analyzed the bulk of Applicant's evidence, or the same category of evidence, in rejecting his *Schlup*-type claims throughout his multiple state habeas applications. For the most part, then, the "law of the case" doctrine applies. *See State v. Swearingen*, 424 S.W.3d 32, 35–36 (Tex. Crim. App. 2014) (describing the law-of-the-case doctrine). Here, because "the facts and legal issues are virtually identical" to Applicant's prior state habeas applications, the present decision "should be controlled by [this Court's] previous resolution[s]." *Id*. at 36. Nonetheless, the State will address all of Applicant's contentions.

---

[15] Applicant's unknowing-use-of-false-evidence claim is largely supported by evidence that Applicant believes proves his innocence. Thus, the State addresses these two issues—gateway innocence and prima facie showing—together.

As to the proper-timing inference to be drawn from morphologically intact sperm, 1.SHCR-07, at 76–79, Applicant previously argued this point to the Court and provided it with studies showing that morphologically intact sperm can remain in a vaginal cavity for up to ten days, calling the State's evidence on this topic "patently false." *Reed IV*, 271 S.W.3d at 745. This Court held that "even if we assume that Blakley [sic] and Dr. Bayardo underestimated the length of time that sperm will remain intact, we conclude that, given the other evidence in this case, [Applicant] has failed to meet his burden." *Id.* at 750. The decision today should be no different than it was six years ago.

Indeed, Applicant provides the Court with more of the same type of evidence—sperm can *possibly* last longer than 24 to 26 hours in the vaginal cavity.[16] But Applicant's description of the trial testimony is myopic. When Blakely testified, she stated that intact sperm within

---

[16]    In federal court, Applicant attached medical literature to his habeas petition containing the following statements: "The longest time recorded for spermatozoa is 120 hours *and for those with tails the record is 26 hours*" and "[n]on-motile spermatozoa are found usually for seven to 12 hours after coitus; *in exceptional instances, such sperm have been found for 18 to 24 hours*." Second Amend. Pet. Ex. 36, at 136, ECF No. 137-7; Second Amend. Pet. Ex. 37, at 514, ECF No. 137-7 (emphasis added). Unsurprisingly, Applicant does not append these studies, which demonstrate probability of finding intact sperm instead of possibility, to his current application.

Stites's vaginal cavity indicated "recent" deposit. 45.RR.13–14. When asked about the deposit timeframe, Blakely stated she had "published documentation that says that 26 hours is about the outside length of time that tails will remain on a sperm head inside the vaginal tract of the female." 45.RR.16. Trial counsel questioned Blakely about the "published documentation" by "Mr. Willot and Allard" and she conceded that "components of semen" could be found up to 120 hours within the vaginal cavity. 45.RR.16–17. On recall, Blakely also conceded that she had found studies "where sperm was found in a body after 16 days." 55.RR.35–36.

Clement testified that, based on her experience, she did not recall "finding intact sperm more than . . . 20 to 24 hours . . . from the time of the sexual assault [to] the time the collection was made." 51.RR.56. This is entirely consistent with her email—"My testimony did not address the length of time sperm can last in the body based on literature or opinions but rather, my experience in observation of intact sperm on rape kit items based on the length of time from an alleged incident to the time of kit collection." 2.SHCR-07, at 100. Indeed, Clement's email "clarification"

is, practically, the same as her trial testimony, which is most likely why she stated, "the testimony speaks for itself." 2.SHCR-07, at 101.

Further, Dr. Bayardo testified that intact sperm meant "quite recent[]" deposit, saying that deposit could have been two days before the autopsy. 48.RR.121–22, 144. Considering all of the trial evidence, the possibility that sperm could remain morphologically intact longer than 26 hours was before the jury and they still found Applicant guilty (most likely because Applicant's evidence of a consensual relationship was weak—and has always been weak—so there was no reason why Applicant's sperm should have been anywhere in Stites's body at any time). Applicant fails to make a showing that his intactness-of-sperm evidence proves gateway innocence or a prima facie case of falsity.[17]

As to anal injuries, 1.SHCR-07, at 79–80, Applicant takes issue with Dr. Bayardo's testimony that anal dilation occurs "very late in the stages of body decomposition, and that usually occurs 4 or 5 days." 1.SHCR-07, at 79 (quoting 48.RR.142). This, too, was previously

---

[17] Also, Applicant necessarily cannot make out a prima facie case of harm for his unknowing-use-of-false-evidence claim. That is because the standard for such a claim is "more likely than not" test, *see Ex parte Chabot*, 300 S.W.3d at 772, which is the same "more likely than not" standard utilized in the *Schlup*-type claim already rejected by this Court concerning the timing inferences to be drawn from morphologically intact sperm, *see Reed IV*, 271 S.W.3d at 733.

addressed by the Court when Applicant claimed that, after rigor mortis passes, "dilation of the anus [becomes] easier, whether by finger, swab, or another object." *Reed IV*, 271 S.W.3d at 743. It rejected Applicant's contention, holding that "opinions that there is no evidence that Stacey's anus was dilated and that it cannot be concluded with any degree of scientific certainty that Stacey's anus was lacerated merely presents differing opinions that a jury could reject." *Id*. at 748. Moreover, beyond medical evidence, there was "[c]ompelling, independent circumstantial evidence show[ing] that [Applicant] forced Stacey to have vaginal intercourse." *Id*. at 748–49. Additional evidence presenting nothing more than what this Court has already seen should be met with the same response—dismissal.

Additionally, Applicant's current evidence does not actually provide a timeframe in which one would expect to see anal dilation—he only provides evidence that medical examiners *may* mistake anal dilation as evidence of penetration. *See* 2.SHCR-07, at 106, 143, 187. The *possibility* that Dr. Bayardo misinterpreted anal dilation as penile penetration is not affirmative evidence of anything, let alone gateway innocence or falsity. And, in any event, there was "[c]ompelling, independent

40

circumstantial evidence show[ing] that [Applicant] forced Stacey to have vaginal intercourse." *Reed IV*, 271 S.W.3d at 748–49. Again, Applicant fails to prove a prima facie case of false evidence or gateway innocence.[18]

Finally, Applicant tries to claim that the punishment-phase testimony of Royce Smithey was false. 1.SHCR-07, at 80–82. Smithey, the chief investigator for the Special Prosecution Unit, testified that, based on his experience, a hypothetical person with Applicant's past would "present a threat or a danger to other" general population inmates. 63.RR.64–66. On cross-examination, Smithey admitted that his answer to the hypothetical was not that Applicant "could not comport his behavior to the institution." 63.RR.68–69. He further admitted that violent individuals have been sent to Texas prisons and then not committed additional acts of violence. 63.RR.69, 74.

Applicant tries to pigeonhole Smithey's testimony into future-dangerousness predictions made by psychologists and then call it false. *See Coble v. State*, 330 S.W.3d 253, 270–80 (Tex. Crim. App. 2010). But cases like *Coble* did not demonstrate such evidence was false, it was just

---

[18]  Again, Applicant also fails to prove prima facie harm from the supposedly false evidence of anal injuries because the substance of the alleged falsity has already been rejected by this Court using the same test—"more likely than not." *See supra* Note 17.

not admissible under the Texas Rules of Evidence. *Id*. at 279–80. And, Smithey's testimony was not a scientific prediction of future behavior, but a reasonable opinion that someone with Applicant's violent past could be dangerous to other general population inmates. Thus, Applicant does not make a prima facie case of falsity.

In any event, the punishment case against Applicant was overwhelming. In addition to the abduction, rape, and murder of Stites, Applicant emotionally, physically, and sexually abused numerous other women. First was Connie York, a nineteen-year-old who had come home late one evening after swimming with friends. 57.RR.34–35. Applicant grabbed York from behind and told her "don't scream or I'll hurt you." 57.RR.35–36. When York did not listen, Applicant repeatedly struck her, dragged her to her bedroom, and raped her multiple times. 57.RR.37–42.

Next was A.W., a twelve-year-old girl, who was home alone, having fallen asleep on a couch after watching TV. 58.RR.36–42. A.W. awoke when Applicant began pushing her face into the couch and blindfolded and gagged her. 58.RR.42–43. Applicant repeatedly hit A.W. in the head, called vulgar names, and orally, vaginally, and anally raped her. 58.RR.43–49. When A.W. accidentally bit Applicant's penis during forced

oral copulation, Applicant returned to vaginally raping A.W., grabbed her head, and repeatedly bit her face. 58.RR.47.

Then came Lucy Eipper, the mother of two of Applicant's children. 59.RR.13–14, 19–20 Throughout their on-and-off relationship, Applicant physically abused Eipper, including while she was pregnant, and raped her "all the time," including once in front of their two children. 59.RR.14–17, 21, 25–32. Applicant rarely paid child support, he never sent his children presents, and eventually his parental rights were terminated. 59.RR.37–38; SX.155, at 3.

Afterwards, Applicant began "dating" Caroline Rivas, a mildly intellectually disabled woman. 60.RR.39–41. Rivas's caseworker noticed bruises on Rivas's body and, when asked about them, Rivas admitted that Applicant would hurt her if she would not have sex with him. 60.RR.41, 61. Later, Rivas's caseworker noticed that Rivas was walking oddly and sat down gingerly. 60.RR.43. Rivas admitted that Applicant had, the prior evening, hit her, called her vulgar names, and anally raped her. 60.RR.44, 63–65.

Shortly thereafter, and about six months before Stites's murder, Applicant raped Vivian Harbottle underneath a train trestle as she was

43

walking home.  59.RR.87–92.  When she pleaded for her life for the sake of her children, Applicant laughed at her.  59.RR.94.

Finally, and about six months after Stites's murder, Applicant convinced nineteen-year-old Linda Schlueter to give him a ride home at about 3:30 a.m.  61.RR.10, 37–47.  Applicant led her to a remote area and then attacked her.  61.RR.47–58.  After a prolonged struggle, Schlueter asked Applicant what he wanted from her and Applicant responded, "I want a blow job."  61.RR.60.  When Schlueter told Applicant that "you will have to kill me before you get anything," Applicant stated "I guess I'll have to kill you then."  61.RR.60.  Before Schlueter could be raped and murdered, a car drove by and Applicant fled.  61.RR.62–64.

In addition, Applicant was found guilty of felony theft, SX.127, he admitted to using illegal drugs, SX.155, at 3, and he sold crack cocaine on multiple occasions, 61.RR.86–95.  Applicant also behaved poorly while incarcerated—he did not follow jail rules, he fought with other inmates, and he threatened a guard.  65.RR.169.

Finally, a psychological evaluation of Applicant stated what is obvious from his crimes—Applicant was superficially socially facile, angry, resentful, impulsive, and violent.  65.RR.157–58.  He had a

personality disorder, likely Antisocial or Histrionic. 65.RR.159–61. Accordingly, even if Smithey's testimony was false, which it was not, Applicant does not make a prima facie case that it affected his sentence whatsoever or that he is actually innocent of his death sentence. This claim should therefore be dismissed.

### 5. Applicant's evidence unrelated to a particular claim does not prove gateway innocence.

If Applicant desires to have all of his evidence considered for purposes of a *Schlup*-type claim tied to his unknowing-use-of-false-evidence claims, though he does not specifically request it, he still fails to prove gateway innocence.

As mentioned above, the vast majority of the evidence now presented by Applicant has already been considered by the Court, either specifically or in like kind. Challenges to collection of evidence and possible cross-contamination of DNA, 1.SHCR-07, at 24, have already been rejected by this Court, *Reed IV*, 271 S.W.3d at 750. Evidence that Fennell was deceptive, jealous, and violent, 1.SHCR-07, at 27–35, and purportedly had accomplices, 1.SHCR-07, at 35–37, has been rejected as well by this Court, *Reed VI*, 2009 WL 1900364, at *1–2; *Reed V*, 2009 WL 97260, at *1–5; *Reed IV*, 271 S.W.3d at 747. Further, evidence of a

clandestine, consensual relationship between Applicant and Stites, 1.SHCR-07, at 38–41,[19] has also been rejected by this Court, *Reed IV*, 271 S.W.3d at 748–50. And so has evidence regarding the timing inference to be drawn from intact sperm, 1.SHCR-07, at 41–42, 55, the evidence of anal injuries, 1.SHCR-07, at 42–43, 56–58, the presence of sperm in Stites's rectum, 1.SHCR-07, at 43, and whether there was saliva on Stites's breasts, 1.SHCR-07, at 44, been rejected by the Court too, *Reed IV*, 271 S.W.3d at 748–50. Applicant's evidence simply reiterating these already-rejected challenges does nothing to undermine the Courts prior determinations.

Applicant now relies on time-of-death estimates from Drs. Spitz, Baden, and Riddick, to argue that the State's timing theory was off. 1.SHCR-07, at 47–58. But this, too, is simply more of the same. Dr.

---

[19] Applicant claims that his assertion of a consensual-relationship has been "consistent." 1.SHCR-07, at 38. This blatantly ignores that he *denied knowing Stites* when questioned by law enforcement. 48.RR.82–83. And it also ignores that Applicant had never, under oath, provided details of his "consensual" relationship with Stites until he filed his affidavit with his Chapter 64 motion. Thus, there was nothing with which Applicant's almost twenty-year-delayed affidavit could be compared to in order to determine consistency. Moreover, Applicant references several individuals in his latter-day affidavit in an attempt to bolster its credibility, but this Court has already found that these individuals lack credibility. *See Reed IV*, 271 S.W.3d at 735–37, 746 (Kay Westmoreland and Chris Aldridge). This obviously undermines Applicant's own credibility and so does the significantly belated nature of the affidavit. *Id*. at 750 (finding witnesses lacking in credibility because of their late disclosure).

Riddick, in Applicant's third state habeas application, asserted that Dr. Bayardo's time-of-death estimate was scientifically unreliable because certain measurements were not taken from Stites's body upon discovery, including "rigor mortis, post mortem lividity, and body temperature," and "whether that lividity was blanchable." 1.SHCR-03, at 111. Because of this, "it was too late for accurate assessments" of such conditions "to produce a reliable determination of time of death." 1.SHCR-03, at 111.

Now, Drs. Spitz and Baden argue that they can make an accurate time-of-death estimate, 2.SHCR-07, at 104–06, 141–44, but they fail to address Dr. Riddick's—Reed's own, longtime expert's—prior assertions that no accurate time-of-death estimate could ever be made, 2.SHCR-03, at 111–12. And Dr. Riddick has not backed away from this opinion either—"[c]urrently in forensic practice, there is no scientific means of determining [time of death] with precision." 2.SHCR-07, at 182. Indeed, Dr. Spitz seems to agree with this proposition as well, though he mentions it not in his affidavit—"[i]n conclusion, none of the methods used in establishing the time of death are totally reliable and mathematically precise. Dogmatic and pinpoint accuracy in this matter is clearly not achievable." Spitz and Fisher's Medicolegal Investigation

47

of Death 127, (Werner U. Spitz & Daniel J. Spitz eds., 4th ed. 2004).[20] Ultimately, Applicant has "merely present[ed] differing opinion that a jury could reject," *Reed IV*, 271 S.W.3d at 748, and this does not prove gateway innocence, or even suggest it.

Moreover, Applicant's new timing theory contradicts his other attempts to dispute the State's theory of the case. In his first state habeas application, he disputed the 3:00 a.m. time-of-death estimate because an individual, Robert Curtis, saw a "pickup matching in description to the vehicle driven by Ms. Stites on the morning of her disappearance at around 2:50 to 3:00 AM," with two people in it. 1.SHCR-01, at 8. And, in his third application, Applicant relied on "[e]yewitness information from Martha Barnett that she had seen Stacy and Fennell the morning that Stacey was murdered," specifically between 4:45 to 5:30 a.m. thereby attempting to undermine the 3:00 a.m. time-of-death estimate. *Reed IV*, 271 S.W.3d at 716–17, 720; 1.SHCR-03, at 28 ("Several hours *after* the time that the State's experts say Ms. Stites

---

[20] Dr. Baden is a contributor to this treatise as well. Spitz and Fisher's Medicolegal Investigation of Death vii, (Werner U. Spitz & Daniel J. Spitz eds., 4th ed. 2004).

had died, Martha Barnett saw Fennell with Ms. Stites on the morning of the murder.").

Although Applicant does not ask this Court to consider his prior evidence, *which he used in an attempt to overturn his conviction*, the Court should consider both the "old and new," and the Court should also reaffirm its earlier finding:

> [W]e note that what separates this case from the majority of gateway-innocence cases is the complete lack of a cohesive theory of innocence. [Applicant's] claim of innocence is seriously disjointed and fragmented—he presents numerous alterative but critically incomplete theories. By focusing on a romantic relationship between himself and Stacey as well as pointing to several alternative suspects—Fennell, Lawhon, and some unknown dark-skinned man—the new evidence before us fails to tell a complete, rational exculpatory narrative that exonerates [Applicant].

*Reed IV*, 271 S.W.3d at 746. In this sense, Applicant's attack on the time-of-death estimate, now contradicting his own prior evidence, is more of the same scattershot approach and it undermines his gateway-innocence case.

Further, Applicant's new theory of "innocence" requires the Court to conveniently accept Fennell's testimony that he was alone with Stites after about 8:00 p.m. on April 23, 1996, but reject all of his other testimony. This, too, is inconsistent with Applicant's prior evidence. As

49

mentioned above, Applicant alleged that Stites was possibly seen at 2:50 to 3:00 a.m. by Robert Curtis, 1.SHCR-01, at 8, or seen by Barnett between 4:45 to 5:30 a.m, *Reed IV*, 271 S.W.3d at 716–17, 720. In addition, Applicant, in his third state habeas application, claimed that Jennifer and Brenda Prater spotted Stites in the early morning of her murder, between 1:00 and 3:00 a.m (which is also inconsistent with Applicant's current time-of-death estimate). *Id.* at 741–42. Thus, if the Court is to engage in selective credibility determinations, like Applicant requests, it is just as easy for the Court to believe that Stites was not with Fennell in the early morning of her murder, which means that the new time-of-death estimate does not inculpate Fennell. But this still leaves the Court with the same facts which doom Applicant's gateway-innocence case—if there is no credible evidence of a consensual relationship, and there is none, then Applicant's sperm and DNA should not be on and in Stites physically- and sexually-abused body at any time.

Ultimately, Applicant's attempt to cherry-pick facts that now support his latest theory of "innocence" should not be tolerated, and his omission of prior, contradictory evidence, *which he proffered in an attempt to overturn his conviction*, should be considered and held against

him as undermining his "new" time-of-death gateway-innocence case, which he clearly fails to prove with reliable evidence.

Besides the "new" evidence from forensic pathologists, Applicant relies on two former HEB employees—Slater and Ybarra—who state they knew of the "secret," romantic relationship between Applicant and Stites. 2.SHCR-07, at 235–37, 241–42. This Court should find these affiants as lacking credibility.

Slater, a then-high school student and part-time HEB employee, asserts that Stites confided in her that, while the two were having lunch, she was cheating on her fiancé with a "black guy named Rodney and that she didn't know what her fiancé would do if he found out." 2.SHCR-07, at 236. That is patently unbelievable. If Stites was truly afraid that Fennell would find out about her supposed affair with Applicant, why would she tell a *teenaged high school student* and *part-time co-worker* about the affair?

Moreover, Slater admits that she talked to the Bastrop Police in connection with Stites's murder but failed to mention the secret-affair information and admits that she did not "remember telling anyone about the information that Stacey shared with me." 2.SHCR-07, at 236. She

also admits that, in 2003, she was talking to a friend about Stites's murder but did "not tell her anything about what I knew."  2.SHCR-07, at 236.  Instead, Slater admits that the first time she approached anyone was when she read a Facebook post about Applicant's then-upcoming execution date.  She claims to have called the Bastrop District Attorney's Office but does not "recall leaving a message."  2.SHCR-07, at 237.  Instead of follow-up with law enforcement, Slater sought out those aligned with Applicant.  2.SHCR-07, at 237.  Slater's ridiculous tale, her admitted lack of forthrightness, her alignment with Applicant's defense team, and her nearly two-decades-long delay amply prove that she is not worthy of belief.  *See Reed IV*, 271 S.W.3d at 750–51 (finding delay in coming forward as undermining reliability).

Ybarra, another former HEB employee, claims to have seen Stites talking with a "young black man" at HEB and that these interactions would put her "in a good mood."  2.SHCR-07, at 241.  Ybarra then claims to have known that Stites was seeing "this same black man" while engaged to a "police officer" but he does not explain how he knew this.  2.SHCR-07, at 241.  Further, he asserts that Stites would "become a

52

nervous wreck" when her fiancé visited the HEB. 2.SHCR-07, at 241. Ybarra's tale is also unworthy of belief.

Ybarra identifies the "young black man" as Applicant based on a single photograph in a single newspaper article. 2.SHCR-07, at 241. This is the same type of single-photo-identification long-condemned by the Supreme Court as inherently unreliable. *See Simmons v. United States*, 390 U.S. 377, 383 (1968) ("This danger [of incorrect identification] will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw, or if they show him the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized."). And Ybarra provides no details about how he knew Stites was engaged in an affair or had a police-officer fiancé. *See Reed IV*, 271 S.3d at 747 (finding an affiant lacking in credibility because he "offer[ed] no specific facts that have been or could be corroborated").

In addition, the fact that Ybarra was living in a relatively small town and that his former employer, HEB, offered $50,000 for information leading to the identification of Stites's murderer, makes it all the more unbelievable that Ybarra has not come forward in the nearly two decades

since Stites's murder, except, only to talk to "a television crew."  2.SHCR-07, at 241–42.  Ybarra is also not worthy of belief.  *See Reed IV*, 271 S.W.3d at 750–51 (finding delay in coming forward as undermining reliability).

Ultimately, Applicant must come forward "with reliable evidence" to make a persuasive *Schlup*-type claim.  *Reed IV*, 271 S.W.3d at 733.  This includes "exculpatory scientific evidence [or] trustworthy eyewitness accounts."  *Id.*  The only arguably "new" evidence Applicant brings forward is his *un*scientific time-of-death estimates and his *un*trustworthy consensual-relationship affiants.  This evidence is not the type of "reliable evidence" needed to mount an effective gateway-innocence case and this Court should reject it and dismiss Applicant's seventh state habeas application.

### D.  Applicant fails to demonstrate why this Court should reconsider its prior opinions.

This Court interpreted Rule 79.2(d) of the Texas Rules of Appellate Procedure as allowing reconsideration of its past habeas dispositions without temporal limit.  *See Ex parte Moreno*, 245 S.W.3d 419, 427 (Tex. Crim. App. 2008).  Reconsideration is appropriate only "under the most

extraordinary," *id.*, or "compelling circumstances," *id.* at 428. This Court

has noted its hesitancy to exercise such authority, however:

> We should and will be extremely hesitant ever to exercise our authority to reconsider a decision on an initial post-conviction habeas corpus application, particularly after the passage of a substantial number of years. In almost every instance, the State's legitimate interest in the repose and finality of convictions—even its interest in punishment as weighty and irrevocable as the death penalty—will be substantial indeed and ought not to be disturbed, even in the face of a reasonable and good faith argument that our disposition on original submission was "incorrect."

*Id.* at 429. In this case, there is nothing extraordinary or compelling that

requires reconsideration.

First, Applicant is not seeking reconsideration of only his "initial

post-conviction habeas corpus application," but every one of his six prior

applications, all of which this Court thoroughly reviewed. *Reed VI*, 2009

WL 1900364, at *1–2; *Reed V*, 2009 WL 97260, at *1–6; *Reed IV*, 271

S.W.3d at 701–50. Reconsideration after having been provided six

opportunities in state court, not to mention thorough federal-court

analysis of his claims, which found this Court's decisions to be objectively

reasonable, should weigh even more heavily against reconsideration.

Second, Applicant comes to this Court more than five years after it

dismissed the last of his six state habeas applications. And, as discussed

above, all of the evidence he now relies upon could have been discovered with reasonable diligence. *See supra* Argument II(A)(3), (B)(1), (C)(3). Indeed, this Court has previously found Applicant to have engaged in "piecemeal" litigation, *Reed V*, 2009 WL 97260, at \*1, which should significantly counsel against reopening any of Applicant's prior state habeas applications.

Finally, Applicant has failed to prove that this Court was incorrect in any of its prior decisions. His "new" evidence is more of the same and none of it is any more believable than what he has previously provided. Applicant has been provided a bevy of resources, abundant opportunity, and ample time to attack his conviction. His lack of success is not because this Court or the federal courts were in any way wrong, but because his evidence is weak and because his guilt is strong. Thus, the State respectfully urges the Court to decline Applicant's invitation to reconsider its denials and dismissals of Applicant's prior state habeas applications and let finality have its day.

## PRAYER FOR RELIEF

The State respectfully requests that the Court find that Applicant has not met any exception to the abuse-of-the-writ bar or demonstrated that any of his prior state habeas applications warrants reconsideration and, therefore, the State respectfully requests dismissal of Applicant's seventh state habeas application.

Respectfully submitted,

BRYAN GOERTZ
Criminal District Attorney
Bastrop County, Texas

 /s/ Matthew Ottoway
MATTHEW OTTOWAY
Assistant Criminal District Attorney/
Assistant Attorney General
Texas Bar No. 24047707

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel.: (512) 936-1400
Fax: (512) 320-8132
Email: *matthew.ottoway@texasattorney general.gov*

*Attorneys for the State*

**CERTIFICATE OF SERVICE**

I do hereby certify that a true and correct copy of the foregoing pleading was served by placing same in the United States mail, postage prepaid, on this the 6th day of March, 2015, addressed and electronically sent to:

Bryce Benjet
40 Worth Street, Suite 701
New York, New York, 10013
*bbenjet@innocenceproject.org*

Andrew F. MacRae
LEVATINO PACE LLP
1101 S. Capital of Texas Hwy.
Building K, Suite 125
Austin, Texas 78746
*amacrae@levatinopace.com*

Mark S. Chehi
Robert A. Weber
Jason M. Liberi
Nicole A. DiSalvo
Andrew G. Mirsis
SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
One Rodney Square, P.O. Box 636
Wilmington, Delaware 19899
*mchehi@skadden.com*
*robert.weber@skadden.com*

 /s/ Matthew Ottoway
MATTHEW OTTOWAY
Assistant Criminal District Attorney/
Assistant Attorney General